UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

DR. DARASHAN SHAH
d/b/a EMBASSY ROW, LLC
238 Brookville Road
Muttontown, NY 11545

      *Plaintiff,*

v.

THE KINGDOM OF MOROCCO,
Serve: His Excellency Mohamed Benaissa
      Ministry of Foreign Affairs and Cooperation
      Avenue F. Roosevelt – Rabat - MOROCCO

      *Defendant.*

Case No.: _____

## COMPLAINT

### (For Damages)

Plaintiff DR. DARASHAN SHAH ("Dr. Shah"), by counsel, seeks damages against Defendant the KINGDOM OF MOROCCO ("Morocco") as follows:

1.     Dr. Shah is the owner of real property located at 2113 S Street, N.W., Washington, D.C. (the "Property").

2.     The Kingdom of Morocco is a foreign sovereign, with an embassy located in Washington, D.C.

3.     This Court has jurisdiction over these claims under sections 1330, 1391(f), 1441(d), and 1602 through 1611, of Title 28 of the United States Code. There is a controversy between the parties concerning amounts owed under a commercial lease agreement executed by the parties.

4.     Venue is proper in this judicial district under 28 U.S.C. § 1391(f)(1).

LAW OFFICES
GREENSTEIN DELORME & LUCHS, P.C.
1620 L STREET, N. W.
SUITE 900
WASHINGTON, D.C. 20036-5605
AREA CODE 202-452-1400

## CLAIM FOR RELIEF

5.     In January 2006, Dr. Shah, as Landlord, and Morocco, as Tenant, entered into a Commercial Lease Agreement ("Lease") for the "Property" for a term of twenty four (24) months commencing on February 1, 2006. A copy of the Lease is attached as Exhibit 1.

6.     Pursuant to the terms of the Lease, base rent for the Property is $15,000.00 per month.

7.     The Lease also provides for the payment of Additional Rent to include real estate taxes and insurance.

8.     Morocco never took possession of the Premises.

9.     Morocco failed to pay rent in the amount of One Hundred Fifty Thousand Dollars $150,000.00 to Dr. Shah for the months of February through November 2006.

10.    The Lease contains a service charge provision that states that:

> Other remedies for nonpayment of Rent notwithstanding, if the monthly Base Rental payment is not received by Landlord on or before the tenth (10th) day of the month for which such rent is due, or if any other Rent payment due Landlord by Tenant hereunder is not received by Landlord within ten (10) days of the due date, a service charge of two hundred ($200.00) dollars shall be additionally due and payable by Tenant as an administrative charge for the excess efforts necessitated by such tardiness in payment.

> Exhibit 1 at page 4, Section 5 (c).

As of the date of this Complaint, Morocco owes Dr. Shah One Thousand Eight Hundred Dollars ($1,800.00) for service charges.

11.    The Lease contains an attorney's fees provision that states that:

> Further, the prevailing party in any …litigation between the parties shall be entitled to recover, as part of its judgment, reasonable attorney's fees and costs and expenses incurred therein.

Exhibit 1 at page 14, Section 30 (Choice of Law; Venue; Attorney's Fees).

12.　　Although demand therefore has been made, Morocco has refused and failed to pay the amounts due Dr. Shah as claimed herein.

13.　　As of the date of this Complaint, Morocco is liable to Dr. Shah in the total amount of $160,419.60, which includes:

A.　　One Hundred Fifty Thousand Dollars ($150,000.00) for unpaid rent;

B.　　Five Thousand Eight Hundred Seventy-Eight and 80/100 Dollars ($5,878.80) for real estate taxes;

C.　　Two Thousand Seven Hundred Forty and 80/100 Dollars ($2,740.80) for insurance;

D.　　One Thousand Eight Hundred Dollars ($1,800.00) for service charges.

**WHEREFORE**, Plaintiff DR. DARASHAN SHAH prays for judgment against Morocco in the amount of $160,419.60, pre-judgment interest at the statutory rate, reasonable attorney's fees and costs, any additional amounts due under the Lease through the date of judgment, and such other damages as may be proven at trial.

Respectfully submitted,

GREENSTEIN DELORME & LUCHS, P.C.

Dated: November 3, 2006

Richard W. Luchs, D.C. Bar # 243931
Joshua M. Greenberg, D.C. Bar # 489323
1620 L Street, N.W.
Suite 900
Washington, DC 20036-5605
Telephone: (202) 452-1400

Counsel for Plaintiff Dr. Darashan Shah d/b/a
Embassy Row, LLC

299135v1

- 4 -

# EXHIBIT 1

# COMMERCIAL LEASE AGREEMENT

### The Embassy of the Kingdom of Morocco
to
### THE EMBASSY OF THE KINGDOM OF MOROCCO

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | LANDLORD | 3 |
| 2. | TENANT | 3 |
| 3. | LEASED PREMISES | 3 |
| 4. | TERM | 3 |
| 5. | BASE RENT AND SECURITY DEPOSIT | 4 |
| 6. | ADDITIONAL RENTAL | 5 |
| 7. | TENANT REPAIRS AND MAINTENANCE | 7 |
| 8. | LANDLORD'S REPAIRS | 8 |
| 9. | UTILITY SERVICE | 8 |
| 10. | SIGNS | 8 |
| 11. | USAGE | 8 |
| 12. | INSURANCE | 9 |
| 13. | RELOCATION | 9 |
| 14. | COMPLIANCE WITH LAWS, RULES AND REGULATIONS | 9 |
| 15. | ASSIGNMENT AND SUBLETTING | 9 |
| 16. | ALTERATIONS AND IMPROVEMENTS | 10 |
| 17. | CONDEMNATION | 11 |
| 18. | FIRE AND CASUALTY | 12 |
| 19. | CASUALTY INSURANCE | 13 |
| 20. | WAIVER OF SUBROGATION | 13 |
| 21. | HOLD HARMLESS | 13 |
| 22. | QUIET ENJOYMENT | 13 |
| 23. | LANDLORD'S RIGHT OF ENTRY | 13 |
| 24. | ASSIGNMENT OF LANDLORD'S INTEREST IN LEASE | 14 |
| 25. | LANDLORDS LIEN | 14 |
| 26. | DEFAULT BY TENANT | 14 |
| 27. | REMEDIES FOR TENANT'S DEFAULT | 14 |
| 28. | TERMINATION OF OPTIONS | 15 |
| 29. | WAIVER OF DEFAULT OR REMEDY | 16 |
| 30. | CHOICE OF LAW; VENUE; ATTORNEY'S FEES | 16 |
| 31. | HOLDING OVER | 16 |
| 32. | RIGHTS OF MORTGAGEE | 17 |
| 33. | ESTOPPEL CERTIFICATES | 17 |

| 34. | SUCCESSORS | 17 |
| 35. | REAL ESTATE COMMISSION | 18 |
| 36. | DEFAULT BY LANDLORD | 18 |
| 37. | MECHANIC'S LIENS | 18 |
| 38. | HAZARDOUS WASTE | 18 |
| 39. | ENTIRE AGREEMENT AND LIMITATION OF WARRANTIES | 19 |
| 40. | FINANCIAL STATEMENTS | 19 |
| 41. | FORCE MAJEURE | 19 |
| 42. | MISCELLANEOUS | 20 |
| 43. | NOTICE | 21 |
| 44. | LIMITATION ON TENANT'S DAMAGES | 21 |

**EXHIBITS:**
Exhibit A—Legal Description
Exhibit B—Tenant Improvements
Exhibit C—Sign Criteria
Exhibit D—Rules & Regulations
Exhibit E—Renewal Option
Exhibit F—Right of First Refusal / OPTION TO PURCHASE
Exhibit G - Escalator

2

**COMMERCIAL LEASE AGREEMENT**
THIS LEASE AGREEMENT is entered into by and between:

1. LANDLORD: Embassy Row, LLC
2. TENANT: The Embassy of the Kingdom of Morocco,
3. LEASED PREMISES: In consideration of the rents, terms and covenants of this Commercial Lease Agreement (this "Lease"), Landlord hereby leases to Tenant certain premises (the "Leased Premises") consisting of all rental space of (the "Building") located at **2113 S Street, N.W., Washington, D.C. 20008** , together with the exclusive right to use, the common areas of the Project, which are all areas neither exclusively leased to another tenant nor expressly reserved to or by Landlord. The land upon which the Building is located is described in the attached Exhibit A and, together with the Building, landscaping, parking and driveway areas, sidewalks, and other improvements thereon, shall be referred to in this Lease as the "Project."

4. TERM:
(a) The term of this Lease shall be 24 months (2 years) commencing on **February 1, 2006**, the "Commencement Date" and terminating on the last day of the **24th month** following the Commencement Date (the "Termination Date"). This Commencement Date may be subject to change, however, pursuant to Paragraph 4(c) below.
(b) Tenant acknowledges that it accepts the Leased Premises as suitable for Tenant's purposes subject only to Paragraph 4(c) below, if applicable. If this Lease is executed before the Leased Premises become available for occupancy, or if Landlord cannot acquire possession of the Leased Premises prior to the Commencement Date stated above, Tenant agrees to accept possession of the Leased Premises at such time as Landlord is able to

2

tender the same, which date shall then be the Commencement Date of the Lease term.

(c) Landlord agrees to install at its cost and expense the improvements, if any, described in the plans and specifications described in Exhibit B. If such improvements are not completed and the Leased Premises are not ready for occupancy on the Commencement Date stated above, other than as a result of the omission, delay or default by Tenant or anyone acting under or on behalf of Tenant, the rent under this Lease shall not commence until substantial completion of the work described in said plans and specifications, and the Commencement Date of the Lease term shall be the date of such substantial completion and Tenant secures Certificate of Occupancy. Landlord shall notify Tenant in writing as soon as such improvements are substantially completed and ready for occupancy. If Tenant believes that such improvements have not been substantially completed as aforesaid, Tenant shall notify Landlord in writing of its objections within three (3) days after receipt of the completion notice from Landlord. Landlord shall have a reasonable time after receipt of such notice (but in no event more than 10 days) in which to commence such corrective action as may be necessary and shall notify Tenant in writing as soon as it deems such corrective action has been completed so that the Leased Premises are completed and ready for occupancy. In the event of any dispute as to substantial completion or work performed or required to be performed by Landlord, the certificate of a registered architect shall be conclusive and binding on all parties.

(d) Tenant acknowledges that no representations or promises regarding construction, repairs, alterations, remodeling, or improvements to the Leased Premises have been made by Landlord, its agents, employees, or other representatives, unless such are expressly set forth in this Lease or any Exhibit hereto. Landlord is responsible for applying for and obtaining a Certificate of Occupancy for the Leased Premises and will satisfy itself as to all zoning and similar restrictions and regulations prior to commencement of any construction. Failure of Tenant to provide written notice of objections prior to commencement of construction shall be deemed

3

acceptance by Tenant. Tenant agrees that if its occupancy of the Leased Premises is delayed under the circumstances described in Paragraphs 4(b) and (c) above, this Lease shall nonetheless continue in full force and effect. Adjustment of the rent commencement date as above provided shall constitute full settlement of all claims by Tenant against Landlord by reason of any such delay in possession of the Leased Premises. Tenant's taking possession of the Leased Premises shall conclusively establish that the improvements, if any, to be made by Landlord under the terms of this Lease have been completed in accordance with the plans and specifications therefor and that the Leased Premises are in good and satisfactory condition as of the date of Tenant's possession, unless Tenant notifies Landlord in writing specifying any bona fide deficiencies after taking possession. Landlord shall use reasonable diligence to repair promptly such items but Tenant shall have no claim for damages or rebate or abatement of rent by reason thereof. In conjunction with, or at any time after, the Commencement Date, Tenant shall, upon demand, execute and deliver to Landlord an Estoppel letter (as referred to in paragraph 33 herein) to acknowledge the Commencement Date.

## 5. BASE RENT AND SECURITY DEPOSIT:

(a) Tenant agrees to pay to Landlord the following rental amounts (sometimes referred to in this Lease as the "Base Rent" or "Base Rental"):

| YEAR | ANNUAL RENTAL | MONTHLY RENTAL |
|------|---------------|----------------|
| 2006 | $180,000.00 | $15,000.00 |
| 2007 | $180,000.00 | $15,000.00 |

Payment of rent is subject to proration for partial months and to adjustment for early or delayed occupancy under the terms hereof.  On the commencement date of the Lease Agreement the first month's Base Rent shall be payable. All subsequent payments shall be made to Landlord monthly, in advance, without demand,

deduction or offset, in lawful money of the United States of America at the address stated below. All installments of Base Rent shall be due and payable on or before the first (1st) day of each month during the Lease term.

(b) Upon the date Tenant executes the Lease Agreement, there shall be due and payable by Tenant a Security Deposit in the amount of **$15,000.00.** Such deposit shall be held by Landlord (without any obligation to pay interest thereon or segregate such money from Landlord's general funds except as may be required by applicable law) as security for the performance of Tenant's obligations under this Lease. Tenant agrees to increase such Security Deposit from time to time so that it is at all times equal to one monthly Base Rental installment plus the average monthly additional rentals arising pursuant to Paragraph 6 below.

Tenant shall deposit cash with Landlord in an amount sufficient so to increase the Security Deposit to such amount within five (5) days after written demand by Landlord. It is expressly understood that the Security Deposit is not an advance payment of rental or a measure of Landlord's damages in the event of Tenant's default under this Lease. Upon the occurrence of any event of default by Tenant under this Lease, Landlord may, from time to time, without prejudice to any other remedy provided herein or provided by law, use, apply, or retain all or part of the Security Deposit for the payment of (i) any Base Rent, (ii) additional rentals arising under Paragraph 6 below, and (iii) other sums due hereunder, including without limitation any amount which Landlord may spend or become obligated to spend by reason of Tenant's default or to compensate Landlord for any damage, injury, expense or liability caused to Landlord by such default or breach (all of which items (i), (ii) and (iii) are sometimes referred to in the aggregate as "Rent"). If any portion of the Security Deposit is so used or applied, Tenant shall, within five (5) days after written demand thereof, deposit cash with Landlord in an amount sufficient to restore the Security Deposit to the amount required by this Paragraph. Tenant's failure to do so shall be an event of default under this Lease. The balance of the Security Deposit shall be returned by Landlord to Tenant at such time after termination of this Lease that all of Tenant's obligations have been fulfilled.

## LANDLORD CONCESSIONS

**Landlord agrees, upon ratification of this lease agreement, to pay to Cohen and Cohen, or their representatives, the equivalence of 2 (two) months rent for early lease termination of property located at_____. Landlord will further concede to install doors on three areas to delineate privacy in various areas as previously discussed, and to install a room divider wall in the front room on the first floor.**

4

(c) Other remedies for nonpayment of Rent notwithstanding, if the monthly Base Rental payment is not received by Landlord on or before the tenth (10th) day of the month for which such rent is due, or if any other Rent payment due Landlord by Tenant hereunder is not received by Landlord within ten (10) days of the due date, a service charge of two hundred ($200.00) dollars shall be additionally due and payable by Tenant as an administrative charge for the excess efforts necessitated by such tardiness in payment. Such service charge shall be cumulative of any other remedies Landlord may have for nonpayment of Rent and other sums payable under this Lease.

(d) If three (3) consecutive monthly Base Rental payments or any ten (10) [in total, cumulative from the beginning of the Lease term] monthly Base Rental payments during the Lease term (or any renewal or extension thereof) are not received by Landlord within ten (10) days of the due date, the Base Rent hereunder shall automatically become due and payable by Tenant in advance in quarterly installments equal to three (3) months' Base Rent each. The first of such quarterly Base Rent payments shall be due and payable on the first day of the next succeeding month and on the first day of every third (3rd) month thereafter. This remedy shall be cumulative of any other remedies of Landlord under this Lease for nonpayment of Rent.

## 6. ADDITIONAL RENTAL:
(a) Taxes and Insurance:

4

(1) "Tax and Insurance Costs" shall mean all of the following paid or payable by Landlord with respect to the Project or any portion thereof: (i) all federal, state and local sales, use, ad valorem, rental, value added, and other taxes (other than Landlord's income or franchise taxes) and special assessments and other governmental charges; and (ii) all insurance premiums, including, without limitation, public liability, casualty, rental and property damage insurance.

(2) Landlord shall pay all Tax and Insurance Costs; however, Landlord may in its discretion defer such payment to the extent permitted by applicable laws so long as contested by Landlord in good faith and so long as Tenant's occupancy of the Premises is not lawfully disturbed.

((3) Along with the Base Rent Tenant shall pay one-twelfth of its Tax and Insurance Costs as estimated from time to time by Landlord, during the term of this Lease. As soon as available after the expiration of each calendar year during the term of this Lease, Landlord shall submit a reconciliation statement to Tenant setting forth (i) Tenant's portion of the Tax and Insurance Costs due from Tenant for the preceding calendar year, (ii) the amount of Tax and Insurance Costs paid by Tenant during such calendar year, and (iii) the amount, if any, either overpaid or remaining due from Tenant to Landlord. Within (10) days after receipt of such statement, Tenant shall remit to Landlord the amount said statement shows to be due from Tenant or, if Tenant has overpaid, Landlord shall credit the amount overpaid to Tenant's Tax and Insurance Costs next due. If Tenant is not in default and this Lease terminated at the end of such prior year, Landlord shall refund such overpayment to Tenant.

(4) For the calendar years in which this Lease commences and terminates, Tenant's liability for its Tax and Insurance Costs for such partial calendar years shall be subject to pro rata adjustment based upon the number of days of the term elapsing during such partial year. Where the applicable charges are not available prior to the end of the term hereof, then the aforesaid adjustment shall be made between Landlord and Tenant after Landlord shall

have received the charges for such period, it being specifically agreed that Landlord's and Tenant's obligations under this Paragraph shall survive the expiration of the term of this Lease.

(5) The failure of Landlord to exercise its rights hereunder to estimate Tax and Insurance Costs and require payment of same as additional Rent shall not constitute a waiver of such rights which rights may be exercised from time to time at Landlord's discretion.

(b) **Exterior Maintenance:**

Landlord will, at its own expense and design, provide appropriate landscaping to    enhance the building aesthetics.  Tenant shall be responsible for maintenance of the lawn and plantings.

6

Landlord's and Tenant's obligations under this Paragraph shall survive the expiration of the term of this Lease.

(5) The failure of Landlord to exercise its rights hereunder to estimate expenses and require payment of same as additional Rent shall not constitute a waiver of such rights which rights may be exercised from time to time at Landlord's discretion.

(c) In any event, Tenant shall be responsible for insuring and paying all taxes upon Tenant's furniture, machinery, goods, supplies, fixtures, Alterations (below defined) or other improvements, and other property on the Project.

7. **TENANT REPAIRS AND MAINTENANCE:**

(a) Tenant shall maintain all parts of the Leased Premises and their appurtenances (except those for which Landlord is expressly responsible under this Lease) in good, clean and sanitary condition, at its own expense. Tenant shall promptly make all necessary repairs and replacements to the Leased Premises, including but not limited to electric light lamps or tubes, windows, glass and plate glass, interior and exterior doors, any special office entry, interior walls and finish work, floors and floor coverings, downspouts, gutters, heating and air conditioning systems, and plumbing work and fixtures. Replacement and repair parts, materials and equipment shall be of quality equivalent to those initially installed within the Leased Premises, and repair and maintenance work shall be done in a good and workmanlike manner and in accordance with existing laws, rules, regulations

5

and ordinances.

(b) Tenant shall not damage or disturb the integrity, structural integrity, or support of any wall, roof, or foundation of the Building. Any damage to these areas caused by Tenant or Tenant's Representatives (defined in Paragraph 7(g)) shall be promptly repaired by Tenant at its sole cost and expense.

(c) Intentionally Deleted

(d) Tenant shall, at its own cost and expense, enter into a regularly scheduled preventive maintenance service contract with a maintenance contractor for servicing all heating, ventilation and air conditioning systems and equipment within, and any other equipment or machinery installed by Landlord in, or to serve, the Leased Premises. The maintenance contractor and the contract are subject to Landlord approval which shall not be unreasonably withheld. The service contract must include all services suggested by the equipment manufacturer within the operation/maintenance manual and must become effective (and a copy delivered to Landlord) within thirty (30) days of the date Tenant takes possession of the Leased Premises. If Tenant fails to enter into such service contract as required, Landlord shall have the right to do so on Tenant's behalf, and Tenant agrees to pay Landlord the direct cost and direct expense of same upon demand, and such amount shall be considered additional Rent.

(e) Tenant shall at its own expense keep the Leased Premises pest-free and pay all charges for pest control and extermination within the Leased Premises.

(f) At the termination of this Lease, Tenant shall deliver the Leased Premises "broom clean" to Landlord in the same good order and condition as existed at the Commencement Date of this Lease, ordinary wear, natural deterioration beyond the control of Tenant, and damage by fire, tornado or other casualty excepted. Tenant shall give written notice to Landlord at least thirty (30) days prior to vacating the Leased Premises and shall arrange to meet with Landlord for a joint inspection of the Leased Premises prior to vacating. In the event of Tenant's failure to give such notice or arrange such joint inspection, Landlord's inspection at or after Tenant's vacating the Leased Premises shall be conclusively deemed correct for purposes of determining Tenant's responsibility for repairs and restoration.

7 -

(g) Not in limitation on the foregoing, it is expressly understood that Tenant shall repair and pay for all damage caused by the negligence of Tenant, Tenant's employees, officers, directors, partners, agents, invitees, licensees, contractors, representatives, or others for whom Tenant is legally responsible (all such persons and entities being herein collectively referred to as "Tenant's Representatives") or caused by Tenant's default hereunder.

(h) If Landlord shall give Tenant written notice of defects or need for repairs for which Tenant is responsible under this Lease, and if Tenant shall fail to make same within 30 days of Landlord's written notification or such shorter time as reasonable if expedited repair is needed to avoid injury or damage, Landlord shall have the option to cure said defect or repair, and Tenant shall pay to Landlord all costs and expenses incurred on demand.

## 8. LANDLORD'S REPAIRS:

(a) Landlord shall be responsible, at its expense, for, but only for, the structural integrity of the roof, foundation and exterior walls of the Building. In further limitation on Landlord's responsibilities hereunder, (i) any repair to the roof, foundation or exterior walls occasioned by the act of omission of Tenant or Tenant's Representatives shall be the responsibility of Tenant; (ii) the term "walls" as used in this Paragraph 8 shall not include windows, glass or plate glass, interior doors, special store fronts, office entries or exterior doors; and (iii) Landlord's liability with respect to any defects, repairs or maintenance for which Landlord is responsible at its expense under this Lease shall be limited to the cost of such repairs or maintenance or the curing of such defect. Tenant shall promptly give Landlord written notice of defects or need for repairs, after which Landlord shall have 30 days to commence to repair or cure such defect.

(b) Landlord shall perform the work which gives rise to Common Area Maintenance Expenses. If the need for any such work shall come to the attention of Tenant, Tenant will promptly so notify Landlord in writing.

## 9. UTILITY SERVICE:
Tenant shall pay the cost of all utility services including, but not limited to, initial connection charges and deposits and all charges for gas, water, trash disposal, sewer, telephone or other

telecommunications, and electricity used on the Leased Premises. Tenant shall pay all costs caused by Tenant introducing excessive pollutants into the sanitary or storm sewer system, including permits, fees, assessments, and charges levied by any governmental subdivision for any pollutants or solids other than ordinary human waste.

10. SIGNS: No sign, door plaques, advertisement, or notice shall be displayed, painted or affixed by Tenant on any part of the Project, Building, parking facilities, or Leased Premises without prior written consent of Landlord, not to be unreasonably withheld. The color, size, character, style, material, placement and location and method of attachment to the Building shall be subject to Landlord's approval, and to any applicable governmental laws, ordinances, regulations, project specifications, and other requirements. Signs, if approved by Landlord, shall be placed by a contractor approved by Landlord and paid for by Tenant. Tenant shall remove all such signs at the termination of this Lease. Such installations and removals shall be made in such manner as to avoid injury or defacement of the Project and other improvements, and Tenant, at its sole expense, shall repair any injury or defacement, including, without limitation, any discoloration caused by such installation and/or removal. Landlord may erect a sign or signs on the Leased Premises indicating that the Leased Premises are for lease during the six (6) month period prior to the expiration of this Lease.

11. USAGE: Tenant warrants and represents to Landlord that the Leased Premises shall be used and occupied only for the purpose of:

<div align="center">

**EMBASSY of the KINGDOM OF MOROCCO.**

</div>

Change in the stated usage purposes shall be subject to the prior written approval of Landlord not to be unreasonably withheld. Tenant shall occupy the Leased Premises, conduct its business, and control Tenant's Representatives in a lawful and reputable way and as not to create any nuisance. Tenant shall not commit, or allow to be committed,

8

any waste on the Leased Premises or the Project. Tenant may not use the Leased Premises for the use, storage, or distribution of hazardous or environmentally offensive substances, for underground storage, or for any unlawful purposes.

12. INSURANCE:

(a) Tenant shall not permit the Leased Premises to be used in any way which would be hazardous or which would in any way increase the cost of or render void any insurance on the improvements, and Tenant shall immediately, on demand, cease any use which violates the foregoing or to which Landlord's insurer or any governmental or regulatory authority objects. If at any time during the term of this Lease Tenant's use or vacancy shall cause an increase in premiums, and in particular, but without limitation, if the State Board of Insurance or other insurance authority disallows any of Landlord's sprinkler credits or imposes an additional penalty or surcharge in Landlord's insurance premiums because of Tenant's original or subsequent placement or use of storage racks or bins or method of storage or because of the nature of Tenant's inventory or any other act of Tenant, Tenant agrees to pay as additional Rent the increase in Landlord's insurance premiums.

(b) Tenant, at its sole cost and expense, shall procure, maintain, and provide to Landlord a **Certificate of Insurance in** the amount of **$1, 995,000** with Landlord named as loss payee. Tenant, at its sole cost and expense, shall procure, maintain throughout the term of this Lease a policy or policies of insurance insuring Landlord, Landlord's management company and lender, and Tenant against all claims for property damages, personal injury or death of others occurring on or in connection with: (i) the Leased Premises; (ii) the condition of the Leased Premises; (iii) Tenant's operations in and maintenance and use of the Leased Premises; (iv) Tenant's and Tenant's Representatives' use of the common areas of the Project, and (v) Tenant's liability assumed under this Lease. The limits of such policy or policies shall be not less than **$1,000,000.00** combined single limit coverage per occurrence for injury to persons (including death) and/or property damage or destruction, including loss of use.

(c) All such policies shall be procured by Tenant from insurance companies satisfactory to Landlord naming the following as co-insureds: (i) Landlord; (ii) Landlord's management company, **Anne Butler Realty Group, LLC** and, (iii) Landlord's mortgage holder, if any. Certified copies of such policies together with receipt for payment of premiums shall be delivered to Landlord prior to the Commencement Date of this Lease. Not less

7

than fifteen (15) days prior to the expiration date of any such policies, certified copies of renewal policies and evidence of the payment of renewal premiums shall be delivered to Landlord. All such original and renewal policies shall provide for at least thirty (30) days written notice to Landlord before such policy may be canceled or changed to reduce insurance coverage provided thereby. Upon request of Landlord, Tenant further agrees to complete and return to Landlord an insurance questionnaire (such form to be provided by Landlord) regarding Tenant's insurance coverage and intended use of the Leased Premises. Tenant warrants and represents that all information contained in such questionnaire shall be true and correct as of the date thereof and shall be updated by Tenant from time to time upon Landlord's request.

13. Intentionally Deleted

14. **COMPLIANCE WITH LAWS, RULES AND REGULATIONS:** Tenant shall comply with all applicable laws, ordinances, orders, rules and regulations of state, federal, municipal, or other agencies or bodies relating to, the use, condition and occupancy of and business conducted on the Leased Premises, including without limitation, the Americans with Disabilities Act, the Resource Conservation and Recovery Act, the Comprehensive Environmental Response Act, and the rules, regulations and directives of the U.S. Environmental Protection Agency.

15. **ASSIGNMENT AND SUBLETTING:** The Tenant agrees not to assign, transfer, or mortgage this Lease or any right or interest therein or sublet the Leased Premises or any part thereof, without the prior written consent of Landlord such consent not to be unreasonably withheld. No assignment or subletting shall relieve Tenant of its obligations hereunder, and Tenant shall continue to be liable as a principal (and not as a guarantor or surety) to the same extent as though no assignment or subletting

9

had been made. Consent by Landlord to any one assignment or subletting shall not be construed to be consent to any additional assignment or subletting. Each such successive act shall require similar consent of Landlord. Landlord shall be reimbursed by Tenant for any costs or expenses incurred as a result of Tenant's request for consent to any such assignment or subletting, including legal costs not to exceed $1000.00. In the event Tenant subleases the Leased Premises, or any portion thereof, or assigns this Lease with the consent of the Landlord at an annual Base Rental exceeding that stated herein, such excess shall be paid by Tenant to Landlord as additional Rent hereunder within ten (10) days after receipt by Tenant. Upon the occurrence of an "event of default" as defined below, if all or any part of the Leased Premises is then assigned or sublet, Landlord may, in addition to any other remedies provided by this Lease or provided by law, collect directly from the assignee or subtenant all rents due to Tenant. Landlord shall have a security interest in all property on the Leased Premises to secure payment of such sums. Any collection directly by Landlord from the assignee or subtenant shall not be construed, however, to constitute a novation or a release of Tenant from the further performance of its obligations under the Lease. Notwithstanding the foregoing, it is expressly agreed that if this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, 11 U.S.C. Sec. 101, et. seq., as amended (the "Bankruptcy Code"), any and all monies or other considerations payable or otherwise to be delivered in connection with such assignment shall be paid or delivered to Lessor, shall be and remain the exclusive property of Landlord and shall not constitute property of Tenant or of the estate of Tenant within the meaning of the Bankruptcy Code. Any and all monies or other considerations constituting Landlord's Property under the preceding sentence not paid or delivered to Landlord shall be held in trust for the benefit of Landlord and be promptly paid or delivered to Landlord. Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on and after the date of such assignment. Any such assignee shall upon demand execute and deliver to Landlord an instrument confirming such assumption.

16. **ALTERNATIONS AND IMPROVEMENTS:**

(a) Tenant shall not make or perform, or permit the making or performance of, any initial or subsequent tenant finish work or any alterations, installations, decorations, improvements, additions or other physical changes in or about the Leased Premises that are structural in nature or exceed $5000.00 in costs (referred to collectively as "Alterations") without Landlord's prior consent, such consent not to be unreasonably withheld. Landlord shall be under no obligation to allow Alterations of any kind and may withhold its consent without cause.

8

Notwithstanding the foregoing provisions or Landlord's consent to any Alterations, all Alternations shall be made and performed in conformity with and subject to the following provisions: All Alternations shall be made and performed at Tenant's sole cost and expense in a good and workmanlike manner. Alternations shall be made only by contractors or mechanics approved by Landlord, such approval not to be unreasonably withheld. Tenant shall submit to Landlord detailed plans and specifications (including architectural layout, mechanical and structural drawings) for each proposed Alteration and shall not commence any such Alteration without first obtaining Landlord's written approval of such plans and specifications. Prior to the commencement of each proposed Alteration, Tenant shall furnish to Landlord a certificate evidencing worker's compensation insurance coverage for all persons to be employed in connection with such Alterations, including those to be employed by all contractors and subcontractors, and of comprehensive public liability insurance (including property damage coverage) in which Landlord, its agents, and any lessor under any ground or underlying lease, and any mortgagee of the Building shall be named as parties insured, which policies shall be issued by companies and shall be in form and amounts satisfactory to Landlord and shall be maintained by Tenant until the completion of such Alteration. Tenant shall cause its contractor and each subcontractor to provide Landlord with a Certificate of Completion of the Alterations and a Bills Paid Affidavit and full Lien Waiver. Tenant shall, if required by Landlord at the time of Landlord's consent to the Alterations, agree to restore the Leased Premises at the termination of this Lease to their condition prior to making such Alterations. All permits, approvals and certificates
10

required by all governmental authorities shall be timely obtained by Tenant and submitted to Landlord. Notwithstanding Landlord's approval of plans and specifications for any Alterations, all Alterations shall be made and performed in full compliance with all applicable laws, orders, rules, standards and regulations of Federal, State, County, and Municipal authorities, including, without limitation, all directions, pursuant to law, of all public officers, and with all applicable rules, orders, regulations and requirements of the local Board of Fire Underwriters or any similar body ("Applicable Laws"). Landlord's approval shall not in any way be considered an indication that the plans and specifications comply with Applicable Laws. All materials and equipment to be incorporated in the Leased Premises as a result of all Alterations shall be new and first quality. No such materials or equipment shall be subject to any lien, encumbrance, chattel mortgage or title retention or security agreement. Whether such Alterations are being performed by Tenant in connection with Tenant's initial occupancy of the Leased Premises or subsequently, Tenant agrees to make proper application for, and obtain, a Building Permit and a Certificate of Occupancy from the city in which the Leased Premises are located. Tenant shall furnish copies of such permit and certificate to Landlord promptly after issuance of same.

(b) All appurtenances, fixtures, improvements, and other property attached to or installed in the Leased Premises, whether by Landlord or Tenant or others, and whether at Landlord's expense or Tenant's expense, or the joint expense of Landlord and Tenant, shall be and remain the property of Landlord, except that any such fixtures, improvements, additions, and other property which have been installed at the sole expense of Tenant and which are removable without material damage to the Leased Premises shall be and remain the property of Tenant. If no event of default has occurred, Tenant may, and if Landlord so elects Tenant shall, remove any property belonging to Tenant at the end of the term hereof, and Tenant shall repair or, at Landlord's option, shall pay to Landlord the cost of repairing any damage arising from such removal. Any replacements of any property of Landlord, whether made at Tenant's expense or otherwise, shall be and remain the property of Landlord.

17. CONDEMNATION:
(a) If, during the term (or extension or renewal) of this Lease, all or a substantial part of the Leased Premises are taken for any public or quasi-public use under any governmental law, ordinance or regulation, or by right of eminent domain or by private purchase in lieu thereof, and the taking would prevent or materially interfere with the then current use of the Leased Premises, this Lease shall terminate and the Rent shall be prorated during the unexpired portion of this Lease effective on the date physical possession is taken by the condemning authority.
(b) If a portion of the Leased Premises is taken and this Lease is not terminated as provided in Paragraph 17(a) above, if condemnation proceeds are sufficient and if restoration is feasible, Landlord may, at its option restore the Project (other than Alterations) in order to make it reasonably tenantable and suitable for Tenant's approved

9

use. During such restoration, Rent shall be reduced by the amount of business or rent interruption insurance proceeds actually received by Landlord. Upon completion of such restoration, the Rent payable under this Lease during the unexpired portion of the term shall be adjusted to such an extent as may be fair and reasonable under the circumstances.

(c) In the event of such taking or private purchase in lieu thereof, Tenant may seek a separate award for any loss of improvements made or paid for by Tenant, its personal property, and its moving expenses (so long as no such claim diminishes Landlord's claim or award), but all other claims of any nature shall belong to Landlord. In the event Tenant does not receive such a separate award, Landlord shall be entitled to receive any and all sums awarded for the taking.

(d) Notwithstanding anything herein to the contrary, if the holder of any indebtedness secured by a mortgage or deed of trust covering the Building and/or Project requires that the condemnation proceeds be applied to such indebtedness, then Landlord shall have the right to terminate this Lease by delivering written notice of termination to Tenant within fifteen (15) days after such requirement is imposed. All rights and obligations under this Lease shall then cease. If Landlord does not receive
11

condemnation proceeds sufficient for restoration (such as when its mortgagee does not allow the proceeds to be used for such purposes) and if restoration is economically reasonably feasible, Tenant will have the option of supplementing available proceeds to allow restoration, and Tenant's actual costs will be reimbursed through a monthly prorata credit against rent beginning after Landlord's mortgage has been paid in full.

## 18. FIRE AND CASUALTY:

(a) If the Building should be damaged or destroyed by fire, tornado, or other casualty, Tenant shall give immediate verbal and written notice thereof to Landlord.

(b) If the Building should be totally destroyed by fire, tornado, or other casualty, or if it should be so damaged thereby that rebuilding or repairs cannot reasonably be completed within one hundred eighty (180) days after the date on which Landlord is notified by Tenant of such damage, at the option of either Landlord or Tenant, this Lease shall terminate, and the Rent shall be abated during the unexpired portion of this Lease effective upon the date of occurrence of such damage.

(c) If the Building should be damaged by any peril that will be wholly compensated (subject to deductibles) by the insurance maintained by Landlord or if Landlord, in its sole discretion, so chooses notwithstanding a deficiency in such proceeds, and if rebuilding or repairs can reasonably be completed within one hundred eighty (180) days after the date on which Landlord is notified by Tenant of such damage, this Lease shall not terminate, and Landlord shall then proceed with reasonable diligence to rebuild and repair the Building to substantially the same condition in which it existed prior to such damage. Landlord shall not be required, however, to rebuild, repair, or replace Tenant's furniture, fixtures, Alterations, inventory or other personal property. If the Leased Premises are uninhabitable in whole or in part during restoration, the Rent payable hereunder during the period in which they are uninhabitable shall be reduced by uninhabitable portion in both Tenant and Landlords reasonable discretion. If Landlord should fail to complete such repairs and rebuilding within one hundred eighty (180) days after the date on which Landlord is notified by Tenant of such damage, Tenant may terminate this Lease by delivering written notice of termination to Landlord. Such termination shall be Tenant's exclusive remedy and all rights and obligations of the parties under the Lease shall then cease. Notwithstanding the foregoing provisions of this Paragraph 18(c), Tenant agrees that if the Leased Premises, the Building and/or Project are damaged by fire or other casualty caused by the fault or negligence of Tenant or Tenant's Representatives, Tenant shall have no option to terminate this Lease even if the damage cannot be repaired within one hundred eighty (180) days, and the Rent shall not be abated or reduced before or during the repair period.

(d) Notwithstanding anything herein to the contrary, if the holder of any indebtedness secured by a mortgage or deed of trust covering the Building and/or Project requires that the insurance proceeds be applied to such indebtedness, then Landlord shall have the right to terminate this Lease by delivering written notice of termination to Tenant within fifteen (15) days after such requirement is imposed. All rights and obligations

10

under this Lease shall then cease. If Landlord does not receive insurance proceeds sufficient for restoration (such as when its mortgagee does not allow the proceeds to be used for such purposes) and if restoration is economically reasonably feasible, Tenant will have the option of supplementing available proceeds to allow restoration, and Tenant's actual costs will be reimbursed through a monthly prorata credit against rent beginning after Landlord's mortgage has been paid in full.

12

19. CASUALTY INSURANCE: Landlord shall at all times during the term of this Lease maintain a policy or policies of business or rental interruption insurance and a policy or policies of insurance insuring the Building against eighty percent (80%) of full replacement cost for loss or damage by fire, explosion, and other customary hazards. Such policies will not insure any personal property (including, but not limited to any furniture, machinery, goods, or supplies) of Tenant or which Tenant may have in the Leased Premises or any fixtures installed by or paid for by Tenant upon or within the Leased Premises or any Alterations or other improvements which Tenant may construct or install on the Leased Premises or any signs identifying Tenant's business located on the exterior of the Building, insurance for all of which shall be Tenant's responsibility.

20. WAIVER OF SUBROGATION: To the extent that Landlord or Tenant receives casualty insurance proceeds, such recipient hereby waives and releases any and all rights, claims, demands and causes of action such recipient may have against the other on account of any loss or damage occasioned to such recipient or its businesses, real and personal properties, the Leased Premises, the Building, the Project, or its contents, arising from any risk or peril covered by any insurance policy carried by either party and for which such proceeds are actually received. Inasmuch as the above mutual waivers will preclude the assignment of any such claim by way of subrogation (or otherwise) to an insurance company (or any other person), each party hereto agrees immediately to give to its respective insurance companies written notice of the terms of such mutual waivers and to have their respective insurance policies properly endorsed, if necessary, to prevent the invalidation of such insurance coverages by reason of such waivers. This provision shall be cumulative of Paragraph 21 below.

21. HOLD HARMLESS: Landlord shall not be liable to Tenant, Tenant's Representatives, or any other person for any injury to person or damage to property on or about the Leased Premises or the Project caused by the negligence or misconduct of Tenant, Tenant's Representatives, or any other persons entering upon the Leased Premises or the Project. Tenant agrees to indemnify and hold Landlord harmless from any and all loss, attorney's fees, expenses, or claims arising out of any such damage, loss or injury. Tenant shall not be liable to Landlord, Landlord's employees, agents, invitees, licensees or visitors for any injury to person or damage to property on or about the Leased Premises or the Project caused by the negligence or misconduct of Landlord, its agents, employees, agents, invitees, licensees or visitors. Landlord agrees to indemnify and hold Tenant harmless from any and all loss, attorney's fees, expenses, or claims arising out of any such damage, loss or injury.

22. QUIET ENJOYMENT: Landlord warrants that it has full right to execute and to perform this Lease and to grant the estate demised herein and that Tenant, upon payment of the required Rent and performance of the covenants and agreements contained in this Lease, shall peaceably and quietly have, hold, and enjoy the Leased Premises during the full term of this Lease, including any extensions or renewals thereof.

23. LANDLORD'S RIGHT OF ENTRY: Landlord shall have the right to enter the Leased Premises for the following reasons: inspection, cleaning or making repairs, making such alterations or additions as Landlord may deem necessary or desirable; installation of utility lines servicing the Leased Premises or any other space in the Building, determining Tenant's use of the Leased Premises, or for determining if any event of default under this Lease has occurred. Landlord shall attempt to give twenty-four (24) hours verbal notice to Tenant prior to such entry, except in cases of emergency or when an event of default has occurred in which cases Landlord may enter the Leased Premises at any time and without prior notice. During the period that is six (6) months prior to the end of the Lease term, Landlord and Landlord's agents and representatives shall have the right to enter the Leased Premises at any reasonable time during business hours, with reasonable notice, for the purpose of showing the Leased Premises and shall have the right to erect on the Leased Premises a suitable sign indicating the Leased Premises are available for lease.

13

24. **ASSIGNMENT OF LANDLORD'S INTEREST IN LEASE:** Landlord shall have the right to transfer and assign, in whole or in part, its rights and obligations with respect to the Project, the Leased Premises, and this Lease, including Tenant's Security Deposit. Upon and after such transfer, Landlord shall be released from any further obligation under this Lease and Tenant agrees to look solely to Landlord's successor for the performance of such obligations.

25. Intentionally Deleted

26. **DEFAULT BY TENANT:** The following shall be events of default by Tenant tinder this Lease:
    (a) Tenant's failure to pay, within ten (10) days after it is due, any installment of Rent or other payment required pursuant to this Lease;
    (b) Tenant's abandonment or vacation of any part of the Leased Premises, and Tenant is in default of the Rent payments due under this Lease;
    (c) Tenant's failure to comply with any term, provision or covenant of this Lease, other than the defaults listed in the other subparagraphs of this Paragraph 26, and the failure is not cured within ten (10) days after written notice thereof to Tenant;
    (d) Tenant's filing of a petition or adjudication as a debtor or bankrupt insolvent under the Bankruptcy Code or any similar law or statute of the United States or any state; or appointment of a receiver or trustee for all or substantially all of the assets of Tenant; or Tenant's transfer in fraud of creditors or assignment for the benefit of creditors of all or substantially all of Tenant's assets;.
    (e) Tenant doing or permitting to be done any act which results in a lien being filed against the Leased Premises and the same is not removed within sixty (90) days after Landlord's notice thereof to Tenant.

27. **REMEDIES FOR TENANT'S DEFAULT:** Upon the occurrence of any event of default, Landlord shall have the option to pursue any one or more of the following remedies without any prior notice or demand:
    (a) Landlord may terminate this Lease, in which event Tenant shall immediately surrender the Leased Premises to Landlord, and if Tenant falls to do so, Landlord may, without prejudice to any other remedy which it may have, enter upon and take possession of the Leased Premises, and expel or remove Tenant and any other person who may be occupying all or any part of the Leased Premises. Landlord shall not be liable for prosecution or any claim for damages as a result of such actions. Tenant agrees to pay on demand the amount of all losses, costs, expenses, deficiencies, and damages, including, without limitation, reasonable reconfiguration expenses, rental concessions and other inducements to new tenants, advertising expenses and broker's commissions, which Landlord may incur or suffer by reason of Tenant's default or the termination of this Lease under this subparagraph, whether through inability to rent the Leased Premises on satisfactory terms or otherwise. Tenant acknowledges that its obligation to pay Base Rent and all additional Rent hereunder is not only compensation for use of the Leased Premises but also compensation for sums already expended and/or being expended by Landlord with respect to its obligations hereunder and with respect to the Leased Premises, and Tenant acknowledges that Tenant's default in timely payment of all sums due hereunder shall constitute significant financial loss to Landlord. Tenant further acknowledges that any failure to pay any sum due hereunder shall evidence Tenant's inability to meet its debts as they become due. In such event, in addition to Landlord's other remedies hereunder, Landlord shall be entitled to accelerate all Base Rental remaining unpaid hereunder, the entirety of which shall at the option of Landlord be immediately due and payable to the extent allowed by law.

<div align="center">14</div>

    (b) Without termination of this Lease, Landlord may enter upon and take possession of the Leased Premises and expel or remove Tenant and any other person who may be occupying all or any part of the Leased Premises (without being liable for prosecution or any claim for damages therefor) and relet the Leased Premises on behalf of Tenant and receive directly the rent from the reletting. Tenant agrees to pay Landlord on demand any deficiency that may arise by reason of any reletting of the Leased Premises and to reimburse

Landlord on demand for any losses, costs, and expenses, including without limitation, reconfiguration expenses, rental concessions and other inducements to new tenants, advertising costs or broker's commissions, which Landlord may incur or suffer as a result of Tenant's default or in reletting the Leased Premises. In the event Landlord is successful in reletting the Leased Premises at a rental in excess of that agreed to be paid by Tenant pursuant to this Lease, Tenant agrees that Tenant shall not be entitled, under any circumstances, to such excess rental, and Tenant does hereby specifically waive any claim to such excess rental.

(c) Without terminating this Lease, Landlord may enter upon the Leased Premises (without being liable for prosecution or any claim for damages therefor) and do whatever Tenant is obligated to do under the terms of this Lease. Tenant agrees to reimburse Landlord on demand for any losses, costs and expenses which Landlord may incur in effecting compliance with Tenant's obligations under this Lease. Tenant further agrees that Landlord shall not be liable for any damages resulting to Tenant from effecting compliance with Tenant's obligations under this subparagraph, whether caused by the negligence of Landlord or otherwise.

(d) With respect to Landlord's entry upon the Leased Premises under the provisions of subparagraphs (a), (b), and (c) above, no restriction of, or obligation imposed upon Landlord by, District of Columbia Code Section 42 shall apply, such Section being superseded hereby. In particular, but without limitation, Landlord will have no duty or responsibility to Tenant to tender a key in the event of a change of locks, and Tenant will have no further right of possession except as otherwise expressly agreed by Landlord in writing.

(e) Landlord may pursue any remedy provided at law or in equity.

(f) Landlord shall have no duty to relet the Premises, and the failure of Landlord to do so shall not release or affect Tenant's liability for Rent and other charges due hereunder or for damages.

(g) No re-entry or reletting of the Premises or any filing or service of an unlawful detainer action or similar action shall be construed as an election by Landlord to terminate this Lease unless a written notice of such intention is given by Landlord to Tenant. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease and Tenant's right to possession hereunder.

(h) Intentionally Deleted.

28. **TERMINATION OF OPTIONS:** If there exist any options or special rights which Landlord may have granted Tenant under this Lease including, but not limited to, options or rights regarding extensions of the term, expansion of the Leased Premises, or acquisition of any other interest in the Leased Premises, the Building, or the Project, then all such options and rights independent of the leasehold estate hereby granted to Tenant by Landlord. Landlord and Tenant agree and acknowledge that the negotiated consideration for any such options or special rights is Tenant's entry into this Lease and that no portion of any sums due and payable by Tenant to Landlord hereunder is attributable thereto. In addition to, and not in lieu of, the above remedies of Landlord for Tenant's default, any and

15

all such options or special rights shall be automatically terminated upon the occurrence of the following events:

(a) Tenant shall have failed to pay when due any installment of Rent or other sums payable under this Lease for any three (3) consecutive months during the Lease term or any renewal or extension thereof, or for any ten (10) months during the Lease term or any renewal or extension thereof, whether or not said defaults are cured by Tenant; or

(b) Tenant shall have received two (2) or more notices of default under Paragraph 26(c) within any one calendar year with respect to any other covenant of this Lease, whether or not such default(s) is/are cured; or

(c) Tenant shall have committed or suffered to exist any other event of default described under Paragraph 26 above, whether or not such default is cured by Tenant.

29. **WAIVER OF DEFAULT OR REMEDY:** Failure of Landlord to declare a default immediately upon its occurrence, or delay in taking any action in connection with an event of default, shall not be a waiver of the default. Landlord shall have the right to declare the default at any time and take such action as its lawful or authorized under this Lease. Pursuit of any one or more of the remedies set forth in Paragraphs 27 or 28 above shall not preclude pursuit of any one or more of the other remedies provided therein or elsewhere in this Lease

13

or as provided by law, nor shall pursuit of any remedy be a forfeiture or waiver of any Rent or damages accruing to Landlord by reason of the violation of any of the terms of this Lease. Failure by Landlord to enforce one or more of its remedies upon an event of default shall not be construed as a waiver of the default or of any other violation or breach of any of the terms contained in this Lease.

30. **CHOICE OF LAW; VENUE; ATTORNEY'S FEES:** It is specifically stipulated that this Lease shall be interpreted and construed according to the laws of the State in which the Leased Premises are located, and any suit brought on this Lease shall be maintained in the county in which the Leased Premises are located. Further, the prevailing party in any such litigation between the parties shall be entitled to recover, as a part of its judgment, reasonable attorney's fees and costs and expenses incurred therein.

31. **HOLDING OVER:** Tenant will, at the termination of this Lease by lapse of time or otherwise, surrender immediate possession to Landlord. If Landlord agrees in writing that Tenant may hold over after the expiration or termination of this Lease and if the parties do not otherwise agree, the hold over tenancy shall be subject to termination by Landlord at any time upon not less than five (5) days advance written notice, or by Tenant at any time upon not less than thirty (30) days advance written notice. Further, all of the terms and provisions of this Lease shall be applicable during the hold over period, except that Tenant shall pay Landlord from time to time upon demand, as Base Rent for the period of any hold over, an amount equal to 125% of the Base Rent in effect on the date of termination, computed on a daily basis for each day of the hold over period, plus all additional Rent and other sums due hereunder. If Tenant shall fail immediately to surrender possession of the Leased Premises to Landlord upon termination of this Lease, by lapse of time or otherwise, and Landlord has not agreed to such continued possession, as above provided, then, until Landlord can dispossess Tenant under the terms hereof or otherwise, Tenant shall pay Landlord from time to time upon demand, as Base Rent for the period of any such hold over, an amount equal to twice the Base Rent in effect on the date of termination, computed on a daily basis for each day of the hold over period, plus all additional Rent and other sums due hereunder. No holding over by Tenant, whether with or without consent of Landlord, shall operate to extend this Lease except as otherwise expressly agreed by the parties. The preceding provisions of this Paragraph shall not be construed as Landlord's consent for Tenant to hold over.

16

32. **RIGHTS OF MORTGAGEE:** Tenant accepts this Lease subject and subordinate to any recorded mortgage, deed of trust or other lien (a "Mortgage") presently existing or hereafter to exist with respect to the Leased Premises. Further, but without limiting the preceding sentence, Landlord is hereby irrevocably vested with full power and authority to subordinate and/or to evidence such subordination of Tenant's interest under this Lease to any Mortgage hereafter placed on the Leased Premises, and Tenant agrees upon demand to execute such additional instruments subordinating this Lease, and further defining the terms of such subordination, as well as the attornment discussed below, as Landlord or the holder of any such Mortgage, may require. Tenant agrees to provide to the holder of any such Mortgage, whose name and address have been provided to Tenant (a "Mortgagee"), a copy of each notice to Landlord which alleges any act, omission, or condition that might constitute a default by Landlord hereunder and Mortgagee, in its sole discretion, shall have all rights of Landlord hereunder to cure any such default. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any Mortgage on the Leased Premises, at the election of the transferee (sometimes called the "Purchaser") Tenant shall be bound to the Purchaser under the terms and conditions of this Lease for the balance of the remaining Lease term, including any extensions or renewals, with the same force and effect as if the Purchaser were Landlord under this Lease; provided, however, that such Purchaser shall not be liable or bound to Tenant (i) for any act or omission of any prior landlord, (ii) for any offsets or defenses which Tenant might have against any prior landlord, (iii) for or by any Rent which Tenant might have paid for more than the current month, (iv) by any amendment modification of, or consensual termination agreement with respect to, the Lease made without the Mortgagee's consent, (v) for any Security Deposit given by Tenant to a prior landlord unless such deposit is actually received by such Purchaser, (vi) for any repairs or replacements required by this Lease arising prior to the date Purchaser takes possession of the Leased Premises, or (vii) for any moving, relocation or refurbishment allowance or any construction of or

14

payment or allowance for tenant improvements to the Leased Premises or any part thereof for the benefit of Tenant except as set forth in this Lease. Tenant further agrees at the election of the Purchaser to attorn to the Purchaser, including the Mortgagee if it be the Purchaser, as its Landlord. Such attornment shall be effective without the execution of any further instruments upon the Purchaser's succeeding to the interest of Landlord under this Lease. The respective rights and obligations of Tenant and the Purchaser upon the attornment, to the extent of the then remaining balance of the term of this Lease and any extensions and renewals, shall be and are the same as those set forth in this Lease, but Tenant agrees upon demand to execute such additional instruments defining the terms of such attornment as Landlord or the Purchaser may require. Each such Mortgagee and each such Purchaser shall be a third-party beneficiary of the provisions of this Paragraph.

33. **ESTOPPEL CERTIFICATES:** Tenant agrees to furnish on the Commencement Date of this Lease and from time to time within ten (10) days of request by Landlord or Landlord's mortgagee, a statement certifying that the Tenant is in possession of the Leased Premises; the Leased Premises are acceptable; this Lease is in full force and effect; this Lease is unmodified; Tenant claims no present charge, lien, or claim of offset against Rent; the Rent is paid for the current month but is not paid and will not be paid for more than one month in advance (except estimated additional Rent under Paragraph 6); there is no existing default under this Lease; and such other matters as may be reasonably required by Landlord or Landlord's mortgagee.

34. **SUCCESSORS:** This Lease shall be binding upon and inure to the benefit of Landlord and Tenant and their respective heirs, personal representatives, successors and assigns. It is hereby covenanted and agreed that should Landlord's interest in the Leased Premises cease to exist for any reason during the term of the Lease, then notwithstanding the happening of such even at the election of Landlord's successor herein, this Lease shall nevertheless remain unimpaired and in full force and effect and Tenant hereunder agrees to attorn to the then owner of the Leased Premises.

17

35. **REAL ESTATE COMMISSION:** Tenant represents and warrants that it has dealt with no other broker, agent, or other person other than **Anne Butler Realty Company** in connection with this transaction, and that no other broker, agent, or other person brought about this transaction. Landlord and Tenant each agree to indemnify and hold the other harmless from and against any claims by any broker, agent, or other person claiming a commission or other form of compensation by virtue of having dealt with Tenant or Landlord respectively with regard to this transaction. The provisions of this Paragraph shall survive the termination of this Lease.

36. **DEFAULT BY LANDLORD:** Landlord shall not be in default, and Tenant shall have no right to any remedy at law or in equity, unless the act, omission, or condition allegedly giving rise to such default shall have continued uncured or unabated for a period of thirty (30) days following written notice to Landlord (with a copy to any Mortgagee as provided in Paragraph 32 above) or, if such cure or abatement cannot be accomplished within said 30-day period, then, so long as Landlord or Mortgagee has commenced such cure or abatement within such 30-day period and diligently pursues same, such period shall be extended a reasonable time to allow completion of the cure or abatement.

37. **MECHANIC'S LIENS:** Tenant shall have no authority, express or implied, to create or place any lien or encumbrance of any kind or nature whatsoever upon, or in any manner to bind, the interest of Landlord in the Leased Premises or the Project or to charge the Rent payable hereunder for any claim in favor of any person dealing with Tenant, including those who may furnish materials or perform labor for any construction or repairs. Each such claim shall affect, and each such lien shall attach to, if at all, only the leasehold interest granted to Tenant by this Lease. Tenant covenants and agrees that it will pay or cause to be paid all sums legally due and payable by it on account of any labor performed or materials furnished in connection with any work performed on the Leased premises on which any lien is or can be validly and legally asserted against its leasehold interest in the Leased Premises or the improvements thereon. Tenant further agrees to save and hold Landlord harmless from any and all loss, cost, or expense based on or arising out of claims or liens asserted by parties by virtue of their dealings with Tenant and encumbering the leasehold estate or the right, title and interest of the Landlord in the Leased Premises or the Project. Under no circumstances shall Tenant be or hold itself out to be the agent or representative of Landlord with respect to any Alterations of the Leased Premises

15

whether or not consented to or approved by Landlord hereunder.

**38. HAZARDOUS WASTE:** The term "Hazardous Substances," as used in this Lease shall mean petroleum and petroleum products and by-products, crude oil, pollutants, contaminants, toxic or hazardous wastes, or any other substances, the use of which is regulated, restricted, prohibited or penalized, or the removal or disposal of which is required, by any "Environmental Laws," which term shall mean any and all federal, state or local law, ordinance or other statute of a governmental or quasi-governmental authority relating to the pollution or protection of the environment. Tenant hereby agrees that (i) no activity will be conducted on the Leased Premises that will produce any Hazardous Substances; (ii) the Leased Premises will not be used in any manner not in compliance with local and federal laws for the storage of any Hazardous Substances; (iii) no portion of the Leased Premises will be used as a landfill or a dump; (iv) Tenant will not install any underground tanks of any type; (v) Tenant will not allow any surface or subsurface conditions to exist or come into existence that constitute, or with the passage of time may constitute, a public or private nuisance, (vi) Tenant will not permit any Hazardous Substances to be brought onto the Leased Premises, and if so brought thereon, then the same shall be stored and used in compliance with all local and federal laws regarding same. Landlord or Landlord's representative shall have the right but not the obligation to enter the Leased Premises for the purpose of ensuring compliance with all Environmental Laws. If Tenant in any manner contaminates the Leased Premises, then Tenant shall promptly and diligently institute proper and thorough clean-up procedures at Tenant's sole cost. Landlord hereby agrees to defend, indemnify and hold Tenant, its employees, partners, agents, contractors, officers and directors and their heirs, successors, and assigns harmless from any and all costs (including costs of litigation), reasonable

<center>18</center>

attorney's fees, expenses, liabilities, claims, damages or judgments arising or alleged to occur, and that result, or are alleged to result from the actual, or threatened discharge, dispersal, disposal, release or escape of Hazardous Substances or other wastes or pollutants (including, but not limited to asbestos, solid, liquid, gaseous or thermal irritants or contaminants, smoke, vapor, soot, fumes, acids, alkalis, chemicals, and water materials to be recycled, reconditioned or reclaimed), but only as the same are a direct result of any act or omission of Landlord or its agents, employees, contractors or subcontractors. Tenant hereby agrees to defend, indemnify and hold Landlord, its employees, agents, partners, contractors, officers and directors of their heirs, successors, and assigns harmless from any and all costs (including costs of litigation), reasonable attorneys' fees, expenses, liabilities, claims, damages or judgments arising or alleged to occur, and that result, or are alleged to result from the actual, or threatened discharge, dispersal, disposal, release or escape of Hazardous Substances or other wastes or pollutants (including, but not limited to asbestos, solid, liquid, gaseous or thermal irritants or contaminants, smoke, vapor, soot, fumes, acids, alkalis, chemicals, and water materials to be recycled, reconditioned or reclaimed), but only as the same are a direct result of any act or omission of Tenant or Tenant's Representatives. Landlord also agrees not to bring hazardous materials into the Leased Premises.

**39. ENTIRE AGREEMENT AND LIMITATION OF WARRANTIES:** It is expressly agreed by Tenant, as a material consideration for the execution of this Lease, that this Lease is the entire agreement of the parties and that there are and were no verbal representations, warranties, understandings, stipulations agreements, or promises pertaining to this Lease not incorporated in this Lease. Tenant expressly agrees that there are and shall be no implied warranties of merchantability, fitness, habitability, or of any other kind and that Tenant's acceptance of the Leased Premises shall be "as is." It is likewise agreed that this Lease may not be altered, waived, amended, or extended except by an instrument in writing signed by both Landlord and Tenant. Not in limitation upon the foregoing, Landlord agrees that to the extent assignable, all warranties, if any shall exist, from contractors or suppliers with respect to the improvements to the Leased Premises hereunder are hereby partially assigned to Tenant to the extent necessary to avail Tenant of the benefits thereof with respect to its leasehold estate and property located at the Leased Premises.

**40. FINANCIAL STATEMENTS:** From time to time Landlord may need to obtain financing or renew financing on the Project, or perform calculations for various reasons regarding the value of the Project. Tenant hereby agrees to provide to Landlord financial statements on its business when requested, but not more than once annually, indicating the most current year end and quarterly financial status of the business. Landlord will

not deliver such financial statement to any third party except in confidence and only as required by Landlord's lenders or in conjunction with appraisals of the Project.

## 41. FORCE MAJEURE:

(a) Landlord shall not be required to perform any covenant or obligation of this Lease or be liable in damages to Tenant for that time period during which the performance or non-performance of the covenant or obligation is delayed, caused by, or prevented by Tenant or Tenant's Representatives or by an act of God or force majeure.

(b) Except with respect to the payment of Rent or any other sum due hereunder, Tenant shall not be required to perform any covenant or obligation of this Lease or be liable in damages to Landlord for that time period during which the performance or non-performance of the covenant or obligation is delayed, caused by, or prevented by Landlord or Landlord's Representatives or by an act of God or force majeure.

(c) An "act of God" or "force majeure" is defined for purposes of this Lease as strikes, lockouts, sit-downs, material or labor restrictions by any governmental authority, riots, floods, washouts, explosions, earthquakes, fire storms, acts of the public enemy, wars, insurrections and

19

any other similar cause not reasonably within the control of Landlord and which by the exercise of due diligence Landlord is unable, wholly or in part, to prevent or overcome.

## 42. MISCELLANEOUS:

(a) Words of any gender used in this Lease shall be held and construed to include any other gender; and words in the singular number shall be held to include the plural, unless the context otherwise requires.

(b) Each party agrees to furnish to the other, promptly upon demand, a corporate resolution, proof of due authorization by partners, or other appropriate documentation evidencing the due authorization and power of such party to enter into this Lease and the empowerment and authority of the individual signing below to bind his or her principal.

(c) The captions inserted in this Lease are for convenience only and in no way define, limit, or otherwise describe the scope or intent of this Lease or any provision hereof, or in any way affect the interpretation of this Lease.

(d) If any clause or provision of this Lease is illegal, invalid, or unenforceable under present or future laws effective during the term of this Lease, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby; and it is also the intention of the parties to this Lease that in lieu of each clause or provision of this Lease that is illegal, invalid, or unenforceable there be added as a part of this Lease a clause as similar in terms to such illegal, invalid, or unenforceable clause or provision as may be possible and be legal, valid, and enforceable.

(e) Intentionally deleted.

(f) All references in this Lease to "the date hereof" or similar references shall be deemed to refer to the last date, in point of time, on which all parties hereto have executed this Lease.

(g) In the event that Tenant shall fail to perform any duty or obligation hereunder, whether maintenance, repair or replacement of the Leased Premises, maintenance of insurance, or otherwise, then Landlord may, but shall in no event be obligated to, without notice of any kind, take such actions as Landlord deems necessary or appropriate to remedy such Tenant failure, and any sums expended by Landlord together with fair and just compensation for the time and effort of Landlord in such efforts shall be deemed additional Rent hereunder due and payable by Tenant on demand.

(h) If Tenant shall fail to pay, when the same is due and payable, any Rent or any other sum due hereunder, such unpaid amount shall bear interest from the clue date thereof to the date of remittance at the rate of the lesser of 12% per annum and the maximum rate allowed by law.

(i) Landlord does not in any way or for any purpose become a partner with Tenant in the conduct of its business or otherwise, nor a member of a joint venture with Tenant.

(j) Tenant shall not record this Lease without the prior written consent of Landlord. However, upon the request of either party hereto, the other party shall join in the execution of a memorandum or so-called

17

"short form" of this Lease for the purposes of recordation.

(k) Time is of the essence in the performance of all the covenants, conditions, and agreements contained in this Lease.

(l) Any duty, obligation, or debt and any right or remedy arising hereunder and not otherwise consummated and/or extinguished by the express terms hereof at or as of the time of termination of this Lease, whether at the end of the term hereof or otherwise, shall survive such termination as continuing duties, obligations, and debts of the obligated party to the other or continuing rights and remedies of the benefited party against the other.

20

(m) This Agreement may be executed in one or more counterparts, each of which counterpart shall for all purposes be deemed to be an original; but all such counterparts together shall constitute but one instrument.

(n) Attached hereto, marked Exhibit "A" through Exhibit "F", are certain exhibits to this Lease all of which are hereby incorporated herein by reference

(o) Landlord agrees to allow Tenant at Tenant's sole cost and expense to install a basketball goal on the Leased Premises as long as such installation does not materially interfere with or reduce the available parking for the Project. Tenant agrees to restore the Leased Premises to its original condition upon Lease termination or Tenant's vacating of the Leased Premises.

43. **NOTICE:**

(a) All Rent and other payments required to be made by Tenant to Landlord shall be payable to Landlord at the address set forth below or any other address that Landlord may specify from time to time by written notice delivered to Tenant.

(b) All payments, if any, required to be made by Landlord to Tenant shall be payable to Tenant at the address set forth below or at any other address that Tenant may specify from time to time by written notice delivered to Landlord.

(c) Any notice or document required or permitted to be delivered by this Lease shall be deemed to be delivered (whether or not actually received) when deposited in the United States Mail, postage prepaid, certified mail return receipt requested, addressed to the parties at the respective addresses set forth below or such other address as hereinafter specified by notice given in accordance with this paragraph.

44. **LIMITATION ON TENANT'S DAMAGES:** Tenant agrees that any liability of Landlord under this Lease shall be limited solely to Landlord's interest in the Project, and no other assets of Landlord shall be subject to levy or execution.

Executed by Landlord and Tenant as of this 27th day of December, 2005

**LANDLORD**                                        **TENANT**

Embassy Row, LLC                            **The Embassy of the Kingdom of Morocco**
238 Brookville Road                          **1601 21st Street, N.W**
Muttontown, N.Y. 11545                     Washington, D.C. 20009

By: _Darshan Shah_ _by Anne with_    By: _Aicha Afifi, Mahamed El Hajjy_

Title: _Managing Dir / Agent_          Title: _DCM / Ambassay_

Date: _1/09/06_                               Date: _01/09/06_

18

The guaranty hereunder shall be unconditional and absolute and the undersigned waive all rights of subrogation and set-off until all sums under this guaranty are fully paid. The undersigned further waives all suretyship defenses or defenses in the nature thereof, generally.

If there are two or more guarantors to this guaranty, the obligations shall be joint and several and binding upon and inure to the benefit of the parties, their successors, assigns and personal representatives.


Guaranty:_____


Date:_____

## EXHIBIT A

**Legal Description: Lot 45 / Square 2532 Subdivision of Kalorama, more particularly known as**
**2113 S Street, N.W., Washington, D.C. 20008**

## EXHIBIT B

### TENANT IMPROVEMENTS

Landlord is to cure any and all deferred maintenance in and about property. Landlord is responsible for all repairs to bring building into conformance with standardized building codes of the District of Columbia. All systems (HVAC, plumbing, electrical, security) shall be in good operating condition, and water, gas, and electrical service will be available to the Building.

22

### EXHIBIT "C"
Intentionally Deleted

23

### EXHIBIT "D"

**RULES AND REGULATIONS**

The following Rules and Regulations are prescribed by Landlord in order to provide and maintain, to the best of Landlord's ability, orderly, clean and desirable premises, building and parking facilities for the Tenants therein and to regulate conduct in and use of the Lease Premises, the Building and parking facilities in such a manner as to minimize interference by others in the proper use of the Leased Premises by Tenant. All references to Tenant include not only the Tenant, but also Tenant's agents, employees, invitees, licensees, visitors, assignees, and/or sublesses:

1. Tenant shall not block or obstruct any of the entries, passages, or doors of Building or parking area, or place, empty, or throw rubbish, litter, trash, or material of any nature into such areas, or permit such areas to be used at any time except for ingress or egress of Tenants.

2. Landlord will not be responsible for lost or stolen personal property, equipment, money, or any article taken from the Leased Premises, Building, or parking facilities regardless of how or when loss occurs.

3. The plumbing facilities shall not be used for any other purpose than that of which they are constructed, and no foreign substance of any kind shall be placed therein, and the expense of any breakage, stoppage, or damage resulting from a violation of this provision shall be borne by Tenant.

4. Any additional keys or locks required by Tenant during the term of the Lease shall be the Tenant's responsibility.

5. The common parking facilities are available for use by any and all tenants. Landlord reserves the right to assign or allocate parking in the event of conflicts, abuse, or improper use. It is generally understood that any Tenant should utilize only those parking spaces immediately adjacent to that Tenant's Leased Premises.

Any blockage by any vehicle to any means of ingress or egress to any leased premises, or in

20

"short form" of this Lease for the purposes of recordation.

(k) Time is of the essence in the performance of all the covenants, conditions, and agreements contained in this Lease.

(l) Any duty, obligation, or debt and any right or remedy arising hereunder and not otherwise consummated and/or extinguished by the express terms hereof at or as of the time of termination of this Lease, whether at the end of the term hereof or otherwise, shall survive such termination as continuing duties, obligations, and debts of the obligated party to the other or continuing rights and remedies of the benefited party against the other.

20

(m) This Agreement may be executed in one or more counterparts, each of which counterpart shall for all purposes be deemed to be an original; but all such counterparts together shall constitute but one instrument.

(n) Attached hereto, marked Exhibit "A" through Exhibit "F", are certain exhibits to this Lease all of which are hereby incorporated herein by reference

(o) Landlord agrees to allow Tenant at Tenant's sole cost and expense to install a basketball goal on the Leased Premises as long as such installation does not materially interfere with or reduce the available parking for the Project. Tenant agrees to restore the Leased Premises to its original condition upon Lease termination or Tenant's vacating of the Leased Premises.

43. **NOTICE:**

(a) All Rent and other payments required to be made by Tenant to Landlord shall be payable to Landlord at the address set forth below or any other address that Landlord may specify from time to time by written notice delivered to Tenant.

(b) All payments, if any, required to be made by Landlord to Tenant shall be payable to Tenant at the address set forth below or at any other address that Tenant may specify from time to time by written notice delivered to Landlord.

(c) Any notice or document required or permitted to be delivered by this Lease shall be deemed to be delivered (whether or not actually received) when deposited in the United States Mail, postage prepaid, certified mail return receipt requested, addressed to the parties at the respective addresses set forth below or such other address as hereinafter specified by notice given in accordance with this paragraph.

44. **LIMITATION ON TENANT'S DAMAGES:** Tenant agrees that any liability of Landlord under this Lease shall be limited solely to Landlord's interest in the Project, and no other assets of Landlord shall be subject to levy or execution.

Executed by Landlord and Tenant as of this 27th day of December, 2005

**LANDLORD**                                      **TENANT**

**Embassy Row, LLC**                  **The Embassy of the Kingdom of Morocco**
238 Brookville Road                    **1601 21st Street, N.W**
Muttontown, N.Y. 11545               Washington, D.C. 20009

By: _(signature)_                          By: _Aicha Afifi, Mohamed El Hajji_
_for Landlord_
Title: _Managing Member_           Title: _DCM / Embassy_
_Embassy Row LLC_
Date: _01 / 16 / 06_                      Date: _01 / 09 / 06_

18

TRANSLATION
MULTILINGUAL

محكمة مقاطعة كولومبيا بالولايات المتحدة الأمريكية
قسم المنازعات المدنية

المدعي:

دكتور دارشان شاه d/b/a إمباسي رو

LLC
238 بروكفيل رود
ميونتتاون، نيو يورك 11545

ضد                                          القضية رقم: ــــــــــــــــ

المدعى عليه:

المملكة المغربية
إعلان طلب حضور: صاحب السمو محمد بن عيسى
وزير الخارجية والتعاون
طريق إف روزفلت – الرباط – المغرب

الشكوى
(للتعويض عن أضرار)

المدعي دكتور دارشان شاه (المشار إليه فيما بعد باسم "دكتور شاه")، عن طريق موكليه، يطالب بالتعويض
ضد المدعى عليه المملكة المغربية (المشار إليها فيما بعد باسم "دولة المغرب") ويقر بما يلي:

1-    دكتور شاه هو مالك العقار الكائن في 2113 شارع S، N.W.، واشنطن دي سي (المشار إليه
        فيما بعد باسم "الممتلكات").

2-    المملكة المغربية هي دولة أجنبية ذات سيادة، لها سفارة كائنة في واشنطن دي سي.

3-    تحكم هذه المحكمة بموجب الأقسام 1330 و1391 (f) و1441 (d) ومن 1602 إلى 1611
        من العنوان 28 من مدونة قوانين الولايات المتحدة الأمريكية. هناك نزاع بين الطرفين بشأن المبالغ
        المستحقة بموجب اتفاق الإيجار التجاري المبرم بين الطرفين.

4-    مكان إقامة الدعوة صحيح في هذه المقاطعة القضائية بموجب العنوان 28 من مدونة قوانين
        الولايات المتحدة الأمريكية رقم 1391 (f) (1).

TRANSLATION
MULTILINGUAL

<div dir="rtl">

**مطالبة بالتعويض**

5- في شهر يناير 2006، أبرم الدكتور شاه، بصفته مؤجر، ومملكة المغرب، بصفتها مستأجر، اتفاق تأجير تجاري ("عقد إيجار") عن "الممتلكات" لمدة أربع وعشرون (24) شهرًا تبدأ في 1 فبراير عام 2006. تم إرفاق نسخة من عقد الإيجار تحت اسم البيان 1.

6- وفقًا لشروط عقد الإيجار، يقدر الإيجار الأساسي للممتلكات بمبلغ 15000.00 دولار أمريكي شهريًا.

7- يوجد بعقد الإيجار أيضًا شرط تشترط سداد إيجار إضافي يشتمل على الضرائب والتأمين.

8- لا تتملك المملكة المغربية المباني مطلقًا.

9- عجزت المملكة المغربية عن سداد مبلغ الإيجار الذي بلغ مائة وخمسون ألف (150000 دولار أمريكي) للدكتور شاه عن الشهور من فبراير/شباط إلى نوفمبر/تشرين ثان 2006.

10- يتضمن عقد الإيجار شرط مصروفات خدمة ينص على ما يلي:

التعويضات الأخرى لعدم سداد الإيجار بالرغم من ذلك، إذا لم يتم يتسلم المالك مدفوعات الإيجار الأساسي الشهري في أو قبل اليوم العاشر (10) من الشهر المستحق عنه الإيجار، أو في حالة عدم استلام أي مدفوعات مستحقة للمالك من قبل المستأجر المعني خلال عشرة (10) أيام من تاريخ الاستحقاق، ستم إضافة مصروفات خدمة مقدارها مائتا (200.00) دولار أمريكي وتكون مستحقة وقابلة للدفع كمصروفات إدارية للجهود الإضافية المستوجبة بناءً على التأخير في السداد.
البيان 1 في الصفحة 4، القسم 5 (c)

اعتبارًا من تاريخ هذه الشكوى، المملكة المغربية تعتبر مدينة للدكتور شاه بمبلغ ألف وثمانمائة (1800.00) دولار أمريكي نظير مصروفات الخدمة.

11- يتضمن عقد الإيجار شرط مصروفات المحاماة الذي ينص على:

بالإضافة إلى ذلك، الطرف الذي يتم الحكم لصالحه في القضية في أي إجراءات تقاضي بين الطرفين له الحق في استرداد، كجزء من الحكم، مصروفات محاماة معقولة وتكاليف ومصروفات تم تكبدها في هذا الصدد.
البيان 1 في الصفحة 14، القسم 30 ( اختيار القانون، جهة الاختصاص، مصروفات المحاماة)

</div>

TRANSLATION
MULTILINGUAL

12- على الرغم من المطالبات التي تم تقديمها، رفضت المملكة الغربية وعجزت عن سداد المبالغ المستحقة للدكتور شاه كما هو مذكور في المطالبة الحالية.

13- اعتبارًا من تاريخ هذه الشكوى، تعتبر المملكة المغربية مدينة لدكتور شاه بمبلغ إجمالي 160419.60 دولار أمريكي، تشمل:

أ- مبلغ مائة وخمسون ألف (150000.00) دولار أمريكي نظير الإيجار غير المدفوع؛

ب- مبلغ خمسة آلاف وثمانمائة وثماني وسبعون دولار وثمانون سنت (5878.80) دولار أمريكي للضرائب العقارية؛

ج- مبلغ ألفان وسبعمائة وأربعون دولار وثمانون سنت (2740.80) دولار أمريكي نظير التأمين؛

د- مبلغ ألف وثمانمائة (1800.00) دولار أمريكي نظير مصروفات الخدمة.

TRANSLATION
MULTILINGUAL

وبناءً على ما تقدم، يطالب المدعي الدكتور شاه بالحكم ضد المملكة المغربية بمبلغ 160419.60 دولار أمريكي وفوائد قبل الحكم بسعر الفائدة القانوني ومصروفات محاماة وتكاليف معقولة وأية مبالغ إضافية مستحقة بموجب عقد الإيجار حتى تاريخ الحكم وأية أضرار أخرى يتم إثباتها أثناء المحاكمة.

مقدمه للموقر،

بتاريخ: نوفمبر/تشرين ثان ___3___ ، 2006

جرينشتاين ديلورو ولوشس

ريتشارد دبليو لوشس، رقم القيد بنقابة محامين مقاطعة كولومبيا 243931
جوشوا إم جرينبرج، رقم القيد بنقابة محامين مقاطعة كولومبيا 48932
1620 شارع إل، إن.دبليو
واشنطن، دي سي 20036-5605
هاتف:1400-452 (202)

هيئة الدفاع عن المدعي دكتور دارشان شاه d/b/a
إمباسي رو، LCC

TRANSLATION
MultiLingual

البيان 1

# COMMERCIAL LEASE AGREEMENT

### The Embassy of the Kingdom of Morocco
to
### THE EMBASSY OF THE KINGDOM OF MOROCCO

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | LANDLORD | 3 |
| 2. | TENANT | 3 |
| 3. | LEASED PREMISES | 3 |
| 4. | TERM | 3 |
| 5. | BASE RENT AND SECURITY DEPOSIT | 4 |
| 6. | ADDITIONAL RENTAL | 5 |
| 7. | TENANT REPAIRS AND MAINTENANCE | 7 |
| 8. | LANDLORD'S REPAIRS | 8 |
| 9. | UTILITY SERVICE | 8 |
| 10. | SIGNS | 8 |
| 11. | USAGE | 8 |
| 12. | INSURANCE | 9 |
| 13. | RELOCATION | 9 |
| 14. | COMPLIANCE WITH LAWS, RULES AND REGULATIONS | 9 |
| 15. | ASSIGNMENT AND SUBLETTING | 9 |
| 16. | ALTERATIONS AND IMPROVEMENTS | 10 |
| 17. | CONDEMNATION | 11 |
| 18. | FIRE AND CASUALTY | 12 |
| 19. | CASUALTY INSURANCE | 13 |
| 20. | WAIVER OF SUBROGATION | 13 |
| 21. | HOLD HARMLESS | 13 |
| 22. | QUIET ENJOYMENT | 13 |
| 23. | LANDLORD'S RIGHT OF ENTRY | 13 |
| 24. | ASSIGNMENT OF LANDLORD'S INTEREST IN LEASE | 14 |
| 25. | LANDLORDS LIEN | 14 |
| 26. | DEFAULT BY TENANT | 14 |
| 27. | REMEDIES FOR TENANT'S DEFAULT | 14 |
| 28. | TERMINATION OF OPTIONS | 15 |
| 29. | WAIVER OF DEFAULT OR REMEDY | 16 |
| 30. | CHOICE OF LAW; VENUE; ATTORNEY'S FEES | 16 |
| 31. | HOLDING OVER | 16 |
| 32. | RIGHTS OF MORTGAGEE | 17 |
| 33. | ESTOPPEL CERTIFICATES | 17 |

1

| 34. | SUCCESSORS | 17 |
|-----|-----------|----|
| 35. | REAL ESTATE COMMISSION | 18 |
| 36. | DEFAULT BY LANDLORD | 18 |
| 37. | MECHANIC'S LIENS | 18 |
| 38. | HAZARDOUS WASTE | 18 |
| 39. | ENTIRE AGREEMENT AND LIMITATION OF WARRANTIES | 19 |
| 40. | FINANCIAL STATEMENTS | 19 |
| 41. | FORCE MAJEURE | 19 |
| 42. | MISCELLANEOUS | 20 |
| 43. | NOTICE | 21 |
| 44. | LIMITATION ON TENANT'S DAMAGES | 21 |

**EXHIBITS:**
Exhibit A—Legal Description
Exhibit B—Tenant Improvements
Exhibit C—Sign Criteria
Exhibit D—Rules & Regulations
Exhibit E—Renewal Option
Exhibit F—Right of First Refusal / OPTION TO PURCHASE
Exhibit G - Escalator

2

## COMMERCIAL LEASE AGREEMENT

THIS LEASE AGREEMENT is entered into by and between:

1. LANDLORD: Embassy Row, LLC
2. TENANT: The Embassy of the Kingdom of Morocco,
3. LEASED PREMISES: In consideration of the rents, terms and covenants of this Commercial Lease Agreement (this "Lease"), Landlord hereby leases to Tenant certain premises (the "Leased Premises") consisting of all rental space of (the "Building") located at 2113 S Street, N.W., Washington, D.C. 20008 , together with the exclusive right to use, the common areas of the Project, which are all areas neither exclusively leased to another tenant nor expressly reserved to or by Landlord. The land upon which the Building is located is described in the attached Exhibit A and, together with the Building, landscaping, parking and driveway areas, sidewalks, and other improvements thereon, shall be referred to in this Lease as the "Project."

4. TERM:
(a) The term of this Lease shall be 24 months (2 years) commencing on **February 1, 2006**, the "Commencement Date" and terminating on the last day of the **24th month** following the Commencement Date (the "Termination Date"). This Commencement Date may be subject to change, however, pursuant to Paragraph 4(c) below.
(b) Tenant acknowledges that it accepts the Leased Premises as suitable for Tenant's purposes subject only to Paragraph 4(c) below, if applicable. If this Lease is executed before the Leased Premises become available for occupancy, or if Landlord cannot acquire possession of the Leased Premises prior to the Commencement Date stated above, Tenant agrees to accept possession of the Leased Premises at such time as Landlord is able to

tender the same, which date shall then be the Commencement Date of the Lease term.

(c) Landlord agrees to install at its cost and expense the improvements, if any, described in the plans and specifications described in Exhibit B. If such improvements are not completed and the Leased Premises are not ready for occupancy on the Commencement Date stated above, other than as a result of the omission, delay or default by Tenant or anyone acting under or on behalf of Tenant, the rent under this Lease shall not commence until substantial completion of the work described in said plans and specifications, and the Commencement Date of the Lease term shall be the date of such substantial completion and Tenant secures Certificate of Occupancy. Landlord shall notify Tenant in writing as soon as such improvements are substantially completed and ready for occupancy. If Tenant believes that such improvements have not been substantially completed as aforesaid, Tenant shall notify Landlord in writing of its objections within three (3) days after receipt of the completion notice from Landlord. Landlord shall have a reasonable time after receipt of such notice (but in no event more than 10 days) in which to commence such corrective action as may be necessary and shall notify Tenant in writing as soon as it deems such corrective action has been completed so that the Leased Premises are completed and ready for occupancy. In the event of any dispute as to substantial completion or work performed or required to be performed by Landlord, the certificate of a registered architect shall be conclusive and binding on all parties.

(d) Tenant acknowledges that no representations or promises regarding construction, repairs, alterations, remodeling, or improvements to the Leased Premises have been made by Landlord, its agents, employees, or other representatives, unless such is expressly set forth in this Lease or any Exhibit hereto. Landlord is responsible for applying for and obtaining a Certificate of Occupancy for the Leased Premises and will satisfy itself as to all zoning and similar restrictions and regulations prior to commencement of any construction. Failure of Tenant to provide written notice of objections prior to commencement of construction shall be deemed

<center>3</center>

acceptance by Tenant. Tenant agrees that if its occupancy of the Leased Premises is delayed under the circumstances described in Paragraphs 4(b) and (c) above, this Lease shall nonetheless continue in full force and effect. Adjustment of the rent commencement date as above provided shall constitute full settlement of all claims by Tenant against Landlord by reason of any such delay in possession of the Leased Premises. Tenant's taking possession of the Leased Premises shall conclusively establish that the improvements, if any, to be made by Landlord under the terms of this Lease have been completed in accordance with the plans and specifications therefor and that the Leased Premises are in good and satisfactory condition as of the date of Tenant's possession, unless Tenant notifies Landlord in writing specifying any bona fide deficiencies after taking possession. Landlord shall use reasonable diligence to repair promptly such items but Tenant shall have no claim for damages or rebate or abatement of rent by reason thereof. In conjunction with, or at any time after, the Commencement Date, Tenant shall, upon demand, execute and deliver to Landlord an Estoppel letter (as referred to in paragraph 33 herein) to acknowledge the Commencement Date.

## 5. BASE RENT AND SECURITY DEPOSIT:

(a) Tenant agrees to pay to Landlord the following rental amounts (sometimes referred to in this Lease as the "Base Rent" or "Base Rental"):

| YEAR | ANNUAL RENTAL | MONTHLY RENTAL |
|------|---------------|----------------|
| 2006 | $180,000.00 | $15,000.00 |
| 2007 | $180,000.00 | $15,000.00 |

Payment of rent is subject to proration for partial months and to adjustment for early or delayed occupancy under the terms hereof.   On the commencement date of the Lease Agreement the first month's Base Rent shall be payable. All subsequent payments shall be made to Landlord monthly, in advance, without demand,

deduction or offset, in lawful money of the United States of America at the address stated below. All installments of Base Rent shall be due and payable on or before the first (1st) day of each month during the Lease term.

(b) Upon the date Tenant executes the Lease Agreement, there shall be due and payable by Tenant a Security Deposit in the amount of $15,000.00. Such deposit shall be held by Landlord (without any obligation to pay interest thereon or segregate such money from Landlord's general funds except as may be required by applicable law) as security for the performance of Tenant's obligations under this Lease. Tenant agrees to increase such Security Deposit from time to time so that it is at all times equal to one monthly Base Rental installment plus the average monthly additional rentals arising pursuant to Paragraph 6 below.

Tenant shall deposit cash with Landlord in an amount sufficient so to increase the Security Deposit to such amount within five (5) days after written demand by Landlord. It is expressly understood that the Security Deposit is not an advance payment of rental or a measure of Landlord's damages in the event of Tenant's default under this Lease. Upon the occurrence of any event of default by Tenant under this Lease, Landlord may, from time to time, without prejudice to any other remedy provided herein or provided by law, use, apply, or retain all or part of the Security Deposit for the payment of (i) any Base Rent, (ii) additional rentals arising under Paragraph 6 below, and (iii) other sums due hereunder, including without limitation any amount which Landlord may spend or become obligated to spend by reason of Tenant's default or to compensate Landlord for any damage, injury, expense or liability caused to Landlord by such default or breach (all of which items (i), (ii) and (iii) are sometimes referred to in the aggregate as "Rent"). If any portion of the Security Deposit is so used or applied, Tenant shall, within five (5) days after written demand thereof, deposit cash with Landlord in an amount sufficient to restore the Security Deposit to the amount required by this Paragraph. Tenant's failure to do so shall be an event of default under this Lease. The balance of the Security Deposit shall be returned by Landlord to Tenant at such time after termination of this Lease that all of Tenant's obligations have been fulfilled.

## LANDLORD CONCESSIONS

**Landlord agrees, upon ratification of this lease agreement, to pay to Cohen and Cohen, or their representatives, the equivalence of 2 (two) months rent for early lease termination of property located at_____. Landlord will further concede to install doors on three areas to delineate privacy in various areas as previously discussed, and to install a room divider wall in the front room on the first floor.**

4

(c) Other remedies for nonpayment of Rent notwithstanding, if the monthly Base Rental payment is not received by Landlord on or before the tenth (10th) day of the month for which such rent is due, or if any other Rent payment due Landlord by Tenant hereunder is not received by Landlord within ten (10) days of the due date, a service charge of two hundred ($200.00) dollars shall be additionally due and payable by Tenant as an administrative charge for the excess efforts necessitated by such tardiness in payment. Such service charge shall be cumulative of any other remedies Landlord may have for nonpayment of Rent and other sums payable under this Lease.

(d) If three (3) consecutive monthly Base Rental payments or any ten (10) [in total, cumulative from the beginning of the Lease term] monthly Base Rental payments during the Lease term (or any renewal or extension thereof) are not received by Landlord within ten (10) days of the due date, the Base Rent hereunder shall automatically become due and payable by Tenant in advance in quarterly installments equal to three (3) months' Base Rent each. The first of such quarterly Base Rent payments shall be due and payable on the first day of the next succeeding month and on the first day of every third (3rd) month thereafter. This remedy shall be cumulative of any other remedies of Landlord under this Lease for nonpayment of Rent.

## 6. ADDITIONAL RENTAL:

(a) Taxes and Insurance:

4

(1) "Tax and Insurance Costs" shall mean all of the following paid or payable by Landlord with respect to the Project or any portion thereof: (i) all federal, state and local sales, use, ad valorem, rental, value added, and other taxes (other than Landlord's income or franchise taxes) and special assessments and other governmental charges; and (ii) all insurance premiums, including, without limitation, public liability, casualty, rental and property damage insurance.

(2) Landlord shall pay all Tax and Insurance Costs; however, Landlord may in its discretion defer such payment to the extent permitted by applicable laws so long as contested by Landlord in good faith and so long as Tenant's occupancy of the Premises is not lawfully disturbed.

((3) Along with the Base Rent Tenant shall pay one-twelfth of its Tax and Insurance Costs as estimated from time to time by Landlord, during the term of this Lease. As soon as available after the expiration of each calendar year during the term of this Lease, Landlord shall submit a reconciliation statement to Tenant setting forth (i) Tenant's portion of the Tax and Insurance Costs due from Tenant for the preceding calendar year, (ii) the amount of Tax and Insurance Costs paid by Tenant during such calendar year, and (iii) the amount, if any, either overpaid or remaining due from Tenant to Landlord. Within (10) days after receipt of such statement, Tenant shall remit to Landlord the amount said statement shows to be due from Tenant or, if Tenant has overpaid, Landlord shall credit the amount overpaid to Tenant's Tax and Insurance Costs next due. If Tenant is not in default and this Lease terminated at the end of such prior year, Landlord shall refund such overpayment to Tenant.

(4) For the calendar years in which this Lease commences and terminates, Tenant's liability for its Tax and Insurance Costs for such partial calendar years shall be subject to pro rata adjustment based upon the number of days of the term elapsing during such partial year. Where the applicable charges are not available prior to the end of the term hereof, then the aforesaid adjustment shall be made between Landlord and Tenant after Landlord shall
have received the charges for such period, it being specifically agreed that Landlord's and Tenant's obligations under this Paragraph shall survive the expiration of the term of this Lease.

(5) The failure of Landlord to exercise its rights hereunder to estimate Tax and Insurance Costs and require payment of same as additional Rent shall not constitute a waiver of such rights which rights may be exercised from time to time at Landlord's discretion.

(b) **Exterior Maintenance:**

Landlord will, at its own expense and design, provide appropriate landscaping to     enhance the building aesthetics. Tenant shall be responsible for maintenance of the lawn and plantings.

6

Landlord's and Tenant's obligations under this Paragraph shall survive the expiration of the term of this Lease.

(5) The failure of Landlord to exercise its rights hereunder to estimate expenses and require payment of same as additional Rent shall not constitute a waiver of such rights which rights may be exercised from time to time at Landlord's discretion.

(c) In any event, Tenant shall be responsible for insuring and paying all taxes upon Tenant's furniture, machinery, goods, supplies, fixtures, Alterations (below defined) or other improvements, and other property on the Project.

7. **TENANT REPAIRS AND MAINTENANCE:**

(a) Tenant shall maintain all parts of the Leased Premises and their appurtenances (except those for which Landlord is expressly responsible under this Lease) in good, clean and sanitary condition, at its own expense. Tenant shall promptly make all necessary repairs and replacements to the Leased Premises, including but not limited to electric light lamps or tubes, windows, glass and plate glass, interior and exterior doors, any special office entry, interior walls and finish work, floors and floor coverings, downspouts, gutters, heating and air conditioning systems, and plumbing work and fixtures. Replacement and repair parts, materials and equipment shall be of quality equivalent to those initially installed within the Leased Premises, and repair and maintenance work shall be done in a good and workmanlike manner and in accordance with existing laws, rules, regulations

and ordinances.

(b) Tenant shall not damage or disturb the integrity, structural integrity, or support of any wall, roof, or foundation of the Building. Any damage to these areas caused by Tenant or Tenant's Representatives (defined in Paragraph 7(g)) shall be promptly repaired by Tenant at its sole cost and expense.

(c) Intentionally Deleted

(d) Tenant shall, at its own cost and expense, enter into a regularly scheduled preventive maintenance service contract with a maintenance contractor for servicing all heating, ventilation and air conditioning systems and equipment within, and any other equipment or machinery installed by Landlord in, or to serve, the Leased Premises. The maintenance contractor and the contract are subject to Landlord approval which shall not be unreasonably withheld. The service contract must include all services suggested by the equipment manufacturer within the operation/maintenance manual and must become effective (and a copy delivered to Landlord) within thirty (30) days of the date Tenant takes possession of the Leased Premises. If Tenant fails to enter into such service contract as required, Landlord shall have the right to do so on Tenant's behalf, and Tenant agrees to pay Landlord the direct cost and direct expense of same upon demand, and such amount shall be considered additional Rent.

(e) Tenant shall at its own expense keep the Leased Premises pest-free and pay all charges for pest control and extermination within the Leased Premises.

(f) At the termination of this Lease, Tenant shall deliver the Leased Premises "broom clean" to Landlord in the same good order and condition as existed at the Commencement Date of this Lease, ordinary wear, natural deterioration beyond the control of Tenant, and damage by fire, tornado or other casualty excepted. Tenant shall give written notice to Landlord at least thirty (30) days prior to vacating the Leased Premises and shall arrange to meet with Landlord for a joint inspection of the Leased Premises prior to vacating. In the event of Tenant's failure to give such notice or arrange such joint inspection, Landlord's inspection at or after Tenant's vacating the Leased Premises shall be conclusively deemed correct for purposes of determining Tenant's responsibility for repairs and restoration.

7

(g) Not in limitation on the foregoing, it is expressly understood that Tenant shall repair and pay for all damage caused by the negligence of Tenant, Tenant's employees, officers, directors, partners, agents, invitees, licensees, contractors, representatives, or others for whom Tenant is legally responsible (all such persons and entities being herein collectively referred to as "Tenant's Representatives") or caused by Tenant's default hereunder.

(h) If Landlord shall give Tenant written notice of defects or need for repairs for which Tenant is responsible under this Lease, and if Tenant shall fail to make same within 30 days of Landlord's written notification or such shorter time as reasonable if expedited repair is needed to avoid injury or damage, Landlord shall have the option to cure said defect or repair, and Tenant shall pay to Landlord all costs and expenses incurred on demand.

## 8. LANDLORD'S REPAIRS:

(a) Landlord shall be responsible, at its expense, for, but only for, the structural integrity of the roof, foundation and exterior walls of the Building. In further limitation on Landlord's responsibilities hereunder, (i) any repair to the roof, foundation or exterior walls occasioned by the act of omission of Tenant or Tenant's Representatives shall be the responsibility of Tenant; (ii) the term "walls" as used in this Paragraph 8 shall not include windows, glass or plate glass, interior doors, special store fronts, office entries or exterior doors; and (iii) Landlord's liability with respect to any defects, repairs or maintenance for which Landlord is responsible at its expense under this Lease shall be limited to the cost of such repairs or maintenance or the curing of such defect. Tenant shall promptly give Landlord written notice of defects or need for repairs, after which Landlord shall have 30 days to commence to repair or cure such defect.

(b) Landlord shall perform the work which gives rise to Common Area Maintenance Expenses. If the need for any such work shall come to the attention of Tenant, Tenant will promptly so notify Landlord in writing.

## 9. UTILITY SERVICE: Tenant shall pay the cost of all utility services including, but not limited to, initial connection charges and deposits and all charges for gas, water, trash disposal, sewer, telephone or other

6

telecommunications, and electricity used on the Leased Premises. Tenant shall pay all costs caused by Tenant introducing excessive pollutants into the sanitary or storm sewer system, including permits, fees, assessments, and charges levied by any governmental subdivision for any pollutants or solids other than ordinary human waste.

10. SIGNS: No sign, door plaques, advertisement, or notice shall be displayed, painted or affixed by Tenant on any part of the Project, Building, parking facilities, or Leased Premises without prior written consent of Landlord, not to be unreasonably withheld. The color, size, character, style, material, placement and location and method of attachment to the Building shall be subject to Landlord's approval, and to any applicable governmental laws, ordinances, regulations, project specifications, and other requirements. Signs, if approved by Landlord, shall be placed by a contractor approved by Landlord and paid for by Tenant. Tenant shall remove all such signs at the termination of this Lease. Such installations and removals shall be made in such manner as to avoid injury or defacement of the Project and other improvements, and Tenant, at its sole expense, shall repair any injury or defacement, including, without limitation, any discoloration caused by such installation and/or removal. Landlord may erect a sign or signs on the Leased Premises indicating that the Leased Premises are for lease during the six (6) month period prior to the expiration of this Lease.

11. USAGE: Tenant warrants and represents to Landlord that the Leased Premises shall be used and occupied only for the purpose of:

<div align="center">EMBASSY of the KINGDOM OF MOROCCO.</div>

Change in the stated usage purposes shall be subject to the prior written approval of Landlord not to be unreasonably withheld. Tenant shall occupy the Leased Premises, conduct its business, and control Tenant's Representatives in a lawful and reputable way and as not to create any nuisance. Tenant shall not commit, or allow to be committed,

8

any waste on the Leased Premises or the Project. Tenant may not use the Leased Premises for the use, storage, or distribution of hazardous or environmentally offensive substances, for underground storage, or for any unlawful purposes.

12. INSURANCE:

(a) Tenant shall not permit the Leased Premises to be used in any way which would be hazardous or which would in any way increase the cost of or render void any insurance on the improvements, and Tenant shall immediately, on demand, cease any use which violates the foregoing or to which Landlord's insurer or any governmental or regulatory authority objects. If at any time during the term of this Lease Tenant's use or vacancy shall cause an increase in premiums, and in particular, but without limitation, if the State Board of Insurance or other insurance authority disallows any of Landlord's sprinkler credits or imposes an additional penalty or surcharge in Landlord's insurance premiums because of Tenant's original or subsequent placement or use of storage racks or bins or method of storage or because of the nature of Tenant's inventory or any other act of Tenant, Tenant agrees to pay as additional Rent the increase in Landlord's insurance premiums.

(b) Tenant, at its sole cost and expense, shall procure, maintain, and provide to Landlord a **Certificate of Insurance in the amount of $1, 995,000** with Landlord named as loss payee. Tenant, at its sole cost and expense, shall procure, maintain throughout the term of this Lease a policy or policies of insurance insuring Landlord, Landlord's management company and lender, and Tenant against all claims for property damages, personal injury or death of others occurring on or in connection with: (i) the Leased Premises; (ii) the condition of the Leased Premises; (iii) Tenant's operations in and maintenance and use of the Leased Premises; (iv) Tenant's and Tenant's Representatives' use of the common areas of the Project, and (v) Tenant's liability assumed under this Lease. The limits of such policy or policies shall be not less than **$1,000,000.00** combined single limit coverage per occurrence for injury to persons (including death) and/or property damage or destruction, including loss of use.

(c) All such policies shall be procured by Tenant from insurance companies satisfactory to Landlord naming the following as co-insureds: (i) Landlord; (ii) Landlord's management company, **Anne Butler Realty Group, LLC** and, (iii) Landlord's mortgage holder, if any. Certified copies of such policies together with receipt for payment of premiums shall be delivered to Landlord prior to the Commencement Date of this Lease. Not less

7

than fifteen (15) days prior to the expiration date of any such policies, certified copies of renewal policies and evidence of the payment of renewal premiums shall be delivered to Landlord. All such original and renewal policies shall provide for at least thirty (30) days written notice to Landlord before such policy may be canceled or changed to reduce insurance coverage provided thereby. Upon request of Landlord, Tenant further agrees to complete and return to Landlord an insurance questionnaire (such form to be provided by Landlord) regarding Tenant's insurance coverage and intended use of the Leased Premises. Tenant warrants and represents that all information contained in such questionnaire shall be true and correct as of the date thereof and shall be updated by Tenant from time to time upon Landlord's request.

13. Intentionally Deleted

14. COMPLIANCE WITH LAWS, RULES AND REGULATIONS: Tenant shall comply with all applicable laws, ordinances, orders, rules and regulations of state, federal, municipal, or other agencies or bodies relating to, the use, condition and occupancy of and business conducted on the Leased Premises, including without limitation, the Americans with Disabilities Act, the Resource Conservation and Recovery Act, the Comprehensive Environmental Response Act, and the rules, regulations and directives of the U.S. Environmental Protection Agency.

15. ASSIGNMENT AND SUBLETTING: The Tenant agrees not to assign, transfer, or mortgage this Lease or any right or interest therein nor sublet the Leased Premises or any part thereof, without the prior written consent of Landlord such consent not to be unreasonably withheld. No assignment or subletting shall relieve Tenant of its obligations hereunder, and Tenant shall continue to be liable as a principal (and not as a guarantor or surety) to the same extent as though no assignment or subletting

9

had been made. Consent by Landlord to any one assignment or subletting shall not be construed to be consent to any additional assignment or subletting. Each such successive act shall require similar consent of Landlord. Landlord shall be reimbursed by Tenant for any costs or expenses incurred as a result of Tenant's request for consent to any such assignment or subletting, including legal costs not to exceed $1000.00. In the event Tenant subleases the Leased Premises, or any portion thereof, or assigns this Lease with the consent of the Landlord at an annual Base Rental exceeding that stated herein, such excess shall be paid by Tenant to Landlord as additional Rent hereunder within ten (10) days after receipt by Tenant. Upon the occurrence of an "event of default" as defined below, if all or any part of the Leased Premises is then assigned or sublet, Landlord may, in addition to any other remedies provided by this Lease or provided by law, collect directly from the assignee or subtenant all rents due to Tenant. Landlord shall have a security interest in all property on the Leased Premises to secure payment of such sums. Any collection directly by Landlord from the assignee or subtenant shall not be construed, however, to constitute a novation or a release of Tenant from the further performance of its obligations under the Lease. Notwithstanding the foregoing, it is expressly agreed that if this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, 11 U.S.C. Sec. 101, et. seq., as amended (the "Bankruptcy Code"), any and all monies or other considerations payable or otherwise to be delivered in connection with such assignment shall be paid or delivered to Lessor, shall be and remain the exclusive property of Landlord and shall not constitute property of Tenant or of the estate of Tenant within the meaning of the Bankruptcy Code. Any and all monies or other considerations constituting Landlord's Property under the preceding sentence not paid or delivered to Landlord shall be held in trust for the benefit of Landlord and be promptly paid or delivered to Landlord. Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on and after the date of such assignment. Any such assignee shall upon demand execute and deliver to Landlord an instrument confirming such assumption.

16. ALTERNATIONS AND IMPROVEMENTS:

(a) Tenant shall not make or perform, or permit the making or performance of, any initial or subsequent tenant finish work or any alterations, installations, decorations, improvements, additions or other physical changes in or about the Leased Premises that are structural in nature or exceed $5000.00 in costs (referred to collectively as "Alterations") without Landlord's prior consent, such consent not to be unreasonably withheld. Landlord shall be under no obligation to allow Alterations of any kind and may withhold its consent without cause.

8

Notwithstanding the foregoing provisions or Landlord's consent to any Alterations, all Alternations shall be made and performed in conformity with and subject to the following provisions: All Alternations shall be made and performed at Tenant's sole cost and expense in a good and workmanlike manner. Alternations shall be made only by contractors or mechanics approved by Landlord, such approval not to be unreasonably withheld. Tenant shall submit to Landlord detailed plans and specifications (including architectural layout, mechanical and structural drawings) for each proposed Alteration and shall not commence any such Alteration without first obtaining Landlord's written approval of such plans and specifications. Prior to the commencement of each proposed Alteration, Tenant shall furnish to Landlord a certificate evidencing worker's compensation insurance coverage for all persons to be employed in connection with such Alterations, including those to be employed by all contractors and subcontractors, and of comprehensive public liability insurance (including property damage coverage) in which Landlord, its agents, and any lessor under any ground or underlying lease, and any mortgagee of the Building shall be named as parties insured, which policies shall be issued by companies and shall be in form and amounts satisfactory to Landlord and shall be maintained by Tenant until the completion of such Alteration. Tenant shall cause its contractor and each subcontractor to provide Landlord with a Certificate of Completion of the Alterations and a Bills Paid Affidavit and full Lien Waiver. Tenant shall, if required by Landlord at the time of Landlord's consent to the Alterations, agree to restore the Leased Premises at the termination of this Lease to their condition prior to making such Alterations. All permits, approvals and certificates

10

required by all governmental authorities shall be timely obtained by Tenant and submitted to Landlord. Notwithstanding Landlord's approval of plans and specifications for any Alterations, all Alterations shall be made and performed in full compliance with all applicable laws, orders, rules, standards and regulations of Federal, State, County, and Municipal authorities, including, without limitation, all directions, pursuant to law, of all public officers, and with all applicable rules, orders, regulations and requirements of the local Board of Fire Underwriters or any similar body ("Applicable Laws"). Landlord's approval shall not in any way be considered an indication that the plans and specifications comply with Applicable Laws. All materials and equipment to be incorporated in the Leased Premises as a result of all Alterations shall be new and first quality. No such materials or equipment shall be subject to any lien, encumbrance, chattel mortgage or title retention or security agreement. Whether such Alterations are being performed by Tenant in connection with Tenant's initial occupancy of the Leased Premises or subsequently, Tenant agrees to make proper application for, and obtain, a Building Permit and a Certificate of Occupancy from the city in which the Leased Premises are located. Tenant shall furnish copies of such permit and certificate to Landlord promptly after issuance of same.

(b) All appurtenances, fixtures, improvements, and other property attached to or installed in the Leased Premises, whether by Landlord or Tenant or others, and whether at Landlord's expense or Tenant's expense, or the joint expense of Landlord and Tenant, shall be and remain the property of Landlord, except that any such fixtures, improvements, additions, and other property which have been installed at the sole expense of Tenant and which are removable without material damage to the Leased Premises shall be and remain the property of Tenant. If no event of default has occurred, Tenant may, and if Landlord so elects Tenant shall, remove any property belonging to Tenant at the end of the term hereof, and Tenant shall repair or, at Landlord's option, shall pay to Landlord the cost of repairing any damage arising from such removal. Any replacements of any property of Landlord, whether made at Tenant's expense or otherwise, shall be and remain the property of Landlord.

17. CONDEMNATION:

(a) If, during the term (or extension or renewal) of this Lease, all or a substantial part of the Leased Premises are taken for any public or quasi-public use under any governmental law, ordinance or regulation, or by right of eminent domain or by private purchase in lieu thereof, and the taking would prevent or materially interfere with the then current use of the Leased Premises, this Lease shall terminate and the Rent shall be prorated during the unexpired portion of this Lease effective on the date physical possession is taken by the condemning authority.

(b) If a portion of the Leased Premises is taken and this Lease is not terminated as provided in Paragraph 17(a) above, if condemnation proceeds are sufficient and if restoration is feasible, Landlord may, at its option restore the Project (other than Alterations) in order to make it reasonably tenantable and suitable for Tenant's approved

9

use. During such restoration, Rent shall be reduced by the amount of business or rent interruption insurance proceeds actually received by Landlord. Upon completion of such restoration, the Rent payable under this Lease during the unexpired portion of the term shall be adjusted to such an extent as may be fair and reasonable under the circumstances.

(c) In the event of such taking or private purchase in lieu thereof, Tenant may seek a separate award for any loss of improvements made or paid for by Tenant, its personal property, and its moving expenses (so long as no such claim diminishes Landlord's claim or award), but all other claims of any nature shall belong to Landlord. In the event Tenant does not receive such a separate award, Landlord shall be entitled to receive any and all sums awarded for the taking.

(d) Notwithstanding anything herein to the contrary, if the holder of any indebtedness secured by a mortgage or deed of trust covering the Building and/or Project requires that the condemnation proceeds be applied to such indebtedness, then Landlord shall have the right to terminate this Lease by delivering written notice of termination to Tenant within fifteen (15) days after such requirement is imposed. All rights and obligations under this Lease shall then cease. If Landlord does not receive

11

condemnation proceeds sufficient for restoration (such as when its mortgagee does not allow the proceeds to be used for such purposes) and if restoration is economically reasonably feasible, Tenant will have the option of supplementing available proceeds to allow restoration, and Tenant's actual costs will be reimbursed through a monthly prorata credit against rent beginning after Landlord's mortgage has been paid in full.

## 18. FIRE AND CASUALTY:

(a) If the Building should be damaged or destroyed by fire, tornado, or other casualty, Tenant shall give immediate verbal and written notice thereof to Landlord.

(b) If the Building should be totally destroyed by fire, tornado, or other casualty, or if it should be so damaged thereby that rebuilding or repairs cannot reasonably be completed within one hundred eighty (180) days after the date on which Landlord is notified by Tenant of such damage, at the option of either Landlord or Tenant, this Lease shall terminate, and the Rent shall be abated during the unexpired portion of this Lease effective upon the date of occurrence of such damage.

(c) If the Building should be damaged by any peril that will be wholly compensated (subject to deductibles) by the insurance maintained by Landlord or if Landlord, in its sole discretion, so chooses notwithstanding a deficiency in such proceeds, and if rebuilding or repairs can reasonably be completed within one hundred eighty (180) days after the date on which Landlord is notified by Tenant of such damage, this Lease shall not terminate, and Landlord shall then proceed with reasonable diligence to rebuild and repair the Building to substantially the same condition in which it existed prior to such damage. Landlord shall not be required, however, to rebuild, repair, or replace Tenant's furniture, fixtures, Alterations, inventory or other personal property. If the Leased Premises are uninhabitable in whole or in part during restoration, the Rent payable hereunder during the period in which they are uninhabitable shall be reduced by uninhabitable portion in both Tenant and Landlords reasonable discretion. If Landlord should fail to complete such repairs and rebuilding within one hundred eighty (180) days after the date on which Landlord is notified by Tenant of such damage, Tenant may terminate this Lease by delivering written notice of termination to Landlord. Such termination shall be Tenant's exclusive remedy and all rights and obligations of the parties under the Lease shall then cease. Notwithstanding the foregoing provisions of this Paragraph 18(c), Tenant agrees that if the Leased Premises, the Building and/or Project are damaged by fire or other casualty caused by the fault or negligence of Tenant or Tenant's Representatives, Tenant shall have no option to terminate this Lease even if the damage cannot be repaired within one hundred eighty (180) days, and the Rent shall not be abated or reduced before or during the repair period.

(d) Notwithstanding anything herein to the contrary, if the holder of any indebtedness secured by a mortgage or deed of trust covering the Building and/or Project requires that the insurance proceeds be applied to such indebtedness, then Landlord shall have the right to terminate this Lease by delivering written notice of termination to Tenant within fifteen (15) days after such requirement is imposed. All rights and obligations

under this Lease shall then cease. If Landlord does not receive insurance proceeds sufficient for restoration (such as when its mortgagee does not allow the proceeds to be used for such purposes) and if restoration is economically reasonably feasible, Tenant will have the option of supplementing available proceeds to allow restoration, and Tenant's actual costs will be reimbursed through a monthly prorata credit against rent beginning after Landlord's mortgage has been paid in full.

12

19. CASUALTY INSURANCE: Landlord shall at all times during the term of this Lease maintain a policy or policies of business or rental interruption insurance and a policy or policies of insurance insuring the Building against eighty percent (80%) of full replacement cost for loss or damage by fire, explosion, and other customary hazards. Such policies will not insure any personal property (including, but not limited to any furniture, machinery, goods, or supplies) of Tenant or which Tenant may have in the Leased Premises or any fixtures installed by or paid for by Tenant upon or within the Leased Premises or any Alterations or other improvements which Tenant may construct or install on the Leased Premises or any signs identifying Tenant's business located on the exterior of the Building, insurance for all of which shall be Tenant's responsibility.

20. WAIVER OF SUBROGATION: To the extent that Landlord or Tenant receives casualty insurance proceeds, such recipient hereby waives and releases any and all rights, claims, demands and causes of action such recipient may have against the other on account of any loss or damage occasioned to such recipient or its businesses, real and personal properties, the Leased Premises, the Building, the Project, or its contents, arising from any risk or peril covered by any insurance policy carried by either party and for which such proceeds are actually received. Inasmuch as the above mutual waivers will preclude the assignment of any such claim by way of subrogation (or otherwise) to an insurance company (or any other person), each party hereto agrees immediately to give to its respective insurance companies written notice of the terms of such mutual waivers and to have their respective insurance policies properly endorsed, if necessary, to prevent the invalidation of such insurance coverages by reason of such waivers. This provision shall be cumulative of Paragraph 21 below.

21. HOLD HARMLESS: Landlord shall not be liable to Tenant, Tenant's Representatives, or any other person for any injury to person or damage to property on or about the Leased Premises or the Project caused by the negligence or misconduct of Tenant, Tenant's Representatives, or any other persons entering upon the Leased Premises or the Project. Tenant agrees to indemnify and hold Landlord harmless from any and all loss, attorney's fees, expenses, or claims arising out of any such damage, loss or injury. Tenant shall not be liable to Landlord, Landlord's employees, agents, invitees, licensees or visitors for any injury to person or damage to property on or about the Leased Premises or the Project caused by the negligence or misconduct of Landlord, its agents, employees, agents, invitees, licensees or visitors. Landlord agrees to indemnify and hold Tenant harmless from any and all loss, attorney's fees, expenses, or claims arising out of any such damage, loss or injury.

22. QUIET ENJOYMENT: Landlord warrants that it has full right to execute and to perform this Lease and to grant the estate demised herein and that Tenant, upon payment of the required Rent and performance of the covenants and agreements contained in this Lease, shall peaceably and quietly have, hold, and enjoy the Leased Premises during the full term of this Lease, including any extensions or renewals thereof.

23. LANDLORD'S RIGHT OF ENTRY: Landlord shall have the right to enter the Leased Premises for the following reasons: inspection, cleaning or making repairs, making such alterations or additions as Landlord may deem necessary or desirable; installation of utility lines servicing the Leased Premises or any other space in the Building, determining Tenant's use of the Leased Premises, or for determining if any event of default under this Lease has occurred. Landlord shall attempt to give twenty-four (24) hours verbal notice to Tenant prior to such entry, except in cases of emergency or when an event of default has occurred in which cases Landlord may enter the Leased Premises at any time and without prior notice. During the period that is six (6) months prior to the end of the Lease term, Landlord and Landlord's agents and representatives shall have the right to enter the Leased Premises at any reasonable time during business hours, with reasonable notice, for the purpose of showing the Leased Premises and shall have the right to erect on the Leased Premises a suitable sign indicating the Leased Premises are available for lease.

13

24. **ASSIGNMENT OF LANDLORD'S INTEREST IN LEASE:** Landlord shall have the right to transfer and assign, in whole or in part, its rights and obligations with respect to the Project, the Leased Premises, and this Lease, including Tenant's Security Deposit. Upon and after such transfer, Landlord shall be released from any further obligation under this Lease and Tenant agrees to look solely to Landlord's successor for the performance of such obligations.

25. Intentionally Deleted

26. **DEFAULT BY TENANT:** The following shall be events of default by Tenant under this Lease:

(a) Tenant's failure to pay, within ten (10) days after it is due, any installment of Rent or other payment required pursuant to this Lease;

(b) Tenant's abandonment or vacation of any part of the Leased Premises, and Tenant is in default of the Rent payments due under this Lease;

(c) Tenant's failure to comply with any term, provision or covenant of this Lease, other than the defaults listed in the other subparagraphs of this Paragraph 26, and the failure is not cured within ten (10) days after written notice thereof to Tenant;

(d) Tenant's filing of a petition or adjudication as a debtor or bankrupt insolvent under the Bankruptcy Code or any similar law or statute of the United States or any state; or appointment of a receiver or trustee for all or substantially all of the assets of Tenant; or Tenant's transfer in fraud of creditors or assignment for the benefit of creditors of all or substantially all of Tenant's assets;.

(e) Tenant doing or permitting to be done any act which results in a lien being filed against the Leased Premises and the same is not removed within sixty (90) days after Landlord's notice thereof to Tenant.

27. **REMEDIES FOR TENANT'S DEFAULT:** Upon the occurrence of any event of default, Landlord shall have the option to pursue any one or more of the following remedies without any prior notice or demand:

(a) Landlord may terminate this Lease, in which event Tenant shall immediately surrender the Leased Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which it may have, enter upon and take possession of the Leased Premises, and expel or remove Tenant and any other person who may be occupying all or any part of the Leased Premises. Landlord shall not be liable for prosecution or any claim for damages as a result of such actions. Tenant agrees to pay on demand the amount of all losses, costs, expenses, deficiencies, and damages, including, without limitation, reasonable reconfiguration expenses, rental concessions and other inducements to new tenants, advertising expenses and broker's commissions, which Landlord may incur or suffer by reason of Tenant's default or the termination of this Lease under this subparagraph, whether through inability to rent the Leased Premises on satisfactory terms or otherwise. Tenant acknowledges that its obligation to pay Base Rent and all additional Rent hereunder is not only compensation for use of the Leased Premises but also compensation for sums already expended and/or being expended by Landlord with respect to its obligations hereunder and with respect to the Leased Premises, and Tenant acknowledges that Tenant's default in timely payment of all sums due hereunder shall constitute significant financial loss to Landlord. Tenant further acknowledges that any failure to pay any sum due hereunder shall evidence Tenant's inability to meet its debts as they become due. In such event, in addition to Landlord's other remedies hereunder, Landlord shall be entitled to accelerate all Base Rental remaining unpaid hereunder, the entirety of which shall at the option of Landlord be immediately due and payable to the extent allowed by law.

14

(b) Without termination of this Lease, Landlord may enter upon and take possession of the Leased Premises and expel or remove Tenant and any other person who may be occupying all or any part of the Leased Premises (without being liable for prosecution or any claim for damages therefor) and relet the Leased Premises on behalf of Tenant and receive directly the rent from the reletting. Tenant agrees to pay Landlord on demand any deficiency that may arise by reason of any reletting of the Leased Premises and to reimburse

Landlord on demand for any losses, costs, and expenses, including without limitation, reconfiguration expenses, rental concessions and other inducements to new tenants, advertising costs or broker's commissions, which Landlord may incur or suffer as a result of Tenant's default or in reletting the Leased Premises. In the event Landlord is successful in reletting the Leased Premises at a rental in excess of that agreed to be paid by Tenant pursuant to this Lease, Tenant agrees that Tenant shall not be entitled, under any circumstances, to such excess rental, and Tenant does hereby specifically waive any claim to such excess rental.

(c) Without terminating this Lease, Landlord may enter upon the Leased Premises (without being liable for prosecution or any claim for damages therefor) and do whatever Tenant is obligated to do under the terms of this Lease. Tenant agrees to reimburse Landlord on demand for any losses, costs and expenses which Landlord may incur in effecting compliance with Tenant's obligations under this Lease. Tenant further agrees that Landlord shall not be liable for any damages resulting to Tenant from effecting compliance with Tenant's obligations under this subparagraph, whether caused by the negligence of Landlord or otherwise.

(d) With respect to Landlord's entry upon the Leased Premises under the provisions of subparagraphs (a), (b), and (c) above, no restriction of, or obligation imposed upon Landlord by, District of Columbia Code Section 42 shall apply, such Section being superseded hereby. In particular, but without limitation, Landlord will have no duty or responsibility to Tenant to tender a key in the event of a change of locks, and Tenant will have no further right of possession except as otherwise expressly agreed by Landlord in writing.

(e) Landlord may pursue any remedy provided at law or in equity.

(f) Landlord shall have no duty to relet the Premises, and the failure of Landlord to do so shall not release or affect Tenant's liability for Rent and other charges due hereunder or for damages.

(g) No re-entry or reletting of the Premises or any filing or service of an unlawful detainer action or similar action shall be construed as an election by Landlord to terminate this Lease unless a written notice of such intention is given by Landlord to Tenant. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease and Tenant's right to possession hereunder.

(h) Intentionally Deleted.

28. **TERMINATION OF OPTIONS:** If there exist any options or special rights which Landlord may have granted Tenant under this Lease including, but not limited to, options or rights regarding extensions of the term, expansion of the Leased Premises, or acquisition of any other interest in the Leased Premises, the Building, or the Project, then all such options and rights independent of the leasehold estate hereby granted to Tenant by Landlord. Landlord and Tenant agree and acknowledge that the negotiated consideration for any such options or special rights is Tenant's entry into this Lease and that no portion of any sums due and payable by Tenant to Landlord hereunder is attributable thereto. In addition to, and not in lieu of, the above remedies of Landlord for Tenant's default, any and

<div align="center">15</div>

all such options or special rights shall be automatically terminated upon the occurrence of the following events:

(a) Tenant shall have failed to pay when due any installment of Rent or other sums payable under this Lease for any three (3) consecutive months during the Lease term or any renewal or extension thereof, or for any ten (10) months during the Lease term or any renewal or extension thereof, whether or not said defaults are cured by Tenant; or

(b) Tenant shall have received two (2) or more notices of default under Paragraph 26(c) within any one calendar year with respect to any other covenant of this Lease, whether or not such default(s) is/are cured; or

(c) Tenant shall have committed or suffered to exist any other event of default described under Paragraph 26 above, whether or not such default is cured by Tenant.

29. **WAIVER OF DEFAULT OR REMEDY:** Failure of Landlord to declare a default immediately upon its occurrence, or delay in taking any action in connection with an event of default, shall not be a waiver of the default. Landlord shall have the right to declare the default at any time and take such action as its lawful or authorized under this Lease. Pursuit of any one or more of the remedies set forth in Paragraphs 27 or 28 above shall not preclude pursuit of any one or more of the other remedies provided therein or elsewhere in this Lease

or as provided by law, nor shall pursuit of any remedy be a forfeiture or waiver of any Rent or damages accruing to Landlord by reason of the violation of any of the terms of this Lease. Failure by Landlord to enforce one or more of its remedies upon an event of default shall not be construed as a waiver of the default or of any other violation or breach of any of the terms contained in this Lease.

30. **CHOICE OF LAW; VENUE; ATTORNEY'S FEES:** It is specifically stipulated that this Lease shall be interpreted and construed according to the laws of the State in which the Leased Premises are located, and any suit brought on this Lease shall be maintained in the county in which the Leased Premises are located. Further, the prevailing party in any such litigation between the parties shall be entitled to recover, as a part of its judgment, reasonable attorney's fees and costs and expenses incurred therein.

31. **HOLDING OVER:** Tenant will, at the termination of this Lease by lapse of time or otherwise, surrender immediate possession to Landlord. If Landlord agrees in writing that Tenant may hold over after the expiration or termination of this Lease and if the parties do not otherwise agree, the hold over tenancy shall be subject to termination by Landlord at any time upon not less than five (5) days advance written notice, or by Tenant at any time upon not less than thirty (30) days advance written notice. Further, all of the terms and provisions of this Lease shall be applicable during the hold over period, except that Tenant shall pay Landlord from time to time upon demand, as Base Rent for the period of any hold over, an amount equal to 125% of the Base Rent in effect on the date of termination, computed on a daily basis for each day of the hold over period, plus all additional Rent and other sums due hereunder. If Tenant shall fail immediately to surrender possession of the Leased Premises to Landlord upon termination of this Lease, by lapse of time or otherwise, and Landlord has not agreed to such continued possession, as above provided, then, until Landlord can dispossess Tenant under the terms hereof or otherwise, Tenant shall pay Landlord from time to time upon demand, as Base Rent for the period of any such hold over, an amount equal to twice the Base Rent in effect on the date of termination, computed on a daily basis for each day of the hold over period, plus all additional Rent and other sums due hereunder. No holding over by Tenant, whether with or without consent of Landlord, shall operate to extend this Lease except as otherwise expressly agreed by the parties. The preceding provisions of this Paragraph shall not be construed as Landlord's consent for Tenant to hold over.

16

32. **RIGHTS OF MORTGAGEE:** Tenant accepts this Lease subject and subordinate to any recorded mortgage, deed of trust or other lien (a "Mortgage") presently existing or hereafter to exist with respect to the Leased Premises. Further, but without limiting the preceding sentence, Landlord is hereby irrevocably vested with full power and authority to subordinate and/or to evidence such subordination of Tenant's interest under this Lease to any Mortgage hereafter placed on the Leased Premises, and Tenant agrees upon demand to execute such additional instruments subordinating this Lease, and further defining the terms of such subordination, as well as the attornment discussed below, as Landlord or the holder of any such Mortgage, may require. Tenant agrees to provide to the holder of any such Mortgage, whose name and address have been provided to Tenant (a "Mortgagee"), a copy of each notice to Landlord which alleges any act, omission, or condition that might constitute a default by Landlord hereunder and Mortgagee, in its sole discretion, shall have all rights of Landlord hereunder to cure any such default. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any Mortgage on the Leased Premises, at the election of the transferee (sometimes called the "Purchaser") Tenant shall be bound to the Purchaser under the terms and conditions of this Lease for the balance of the remaining Lease term, including any extensions or renewals, with the same force and effect as if the Purchaser were Landlord under this Lease; provided, however, that such Purchaser shall not be liable or bound to Tenant (i) for any act or omission of any prior landlord, (ii) for any offsets or defenses which Tenant might have against any prior landlord, (iii) for or by any Rent which Tenant might have paid for more than the current month, (iv) by any amendment modification of, or consensual termination agreement with respect to, the Lease made without the Mortgagee's consent, (v) for any Security Deposit given by Tenant to a prior landlord unless such deposit is actually received by such Purchaser, (vi) for any repairs or replacements required by this Lease arising prior to the date Purchaser takes possession of the Leased Premises, or (vii) for any moving, relocation or refurbishment allowance or any construction of or

14

payment or allowance for tenant improvements to the Leased Premises or any part thereof for the benefit of Tenant except as set forth in this Lease. Tenant further agrees at the election of the Purchaser to attorn to the Purchaser, including the Mortgagee if it be the Purchaser, as its Landlord. Such attornment shall be effective without the execution of any further instruments upon the Purchaser's succeeding to the interest of Landlord under this Lease. The respective rights and obligations of Tenant and the Purchaser upon the attornment, to the extent of the then remaining balance of the term of this Lease and any extensions and renewals, shall be and are the same as those set forth in this Lease, but Tenant agrees upon demand to execute such additional instruments defining the terms of such attornment as Landlord or the Purchaser may require. Each such Mortgagee and each such Purchaser shall be a third-party beneficiary of the provisions of this Paragraph.

33. **ESTOPPEL CERTIFICATES:** Tenant agrees to furnish on the Commencement Date of this Lease and from time to time within ten (10) days of request by Landlord or Landlord's mortgagee, a statement certifying that the Tenant is in possession of the Leased Premises; the Leased Premises are acceptable; this Lease is in full force and effect; this Lease is unmodified; Tenant claims no present charge, lien, or claim of offset against Rent; the Rent is paid for the current month but is not paid and will not be paid for more than one month in advance (except estimated additional Rent under Paragraph 6); there is no existing default under this Lease; and such other matters as may be reasonably required by Landlord or Landlord's mortgagee.

34. **SUCCESSORS:** This Lease shall be binding upon and inure to the benefit of Landlord and Tenant and their respective heirs, personal representatives, successors and assigns. It is hereby covenanted and agreed that should Landlord's interest in the Leased Premises cease to exist for any reason during the term of the Lease, then notwithstanding the happening of such even at the election of Landlord's successor herein, this Lease shall nevertheless remain unimpaired and in full force and effect and Tenant hereunder agrees to attorn to the then owner of the Leased Premises.

17

35. **REAL ESTATE COMMISSION:** Tenant represents and warrants that it has dealt with no other broker, agent, or other person other than **Anne Butler Realty Company** in connection with this transaction, and that no other broker, agent, or other person brought about this transaction. Landlord and Tenant each agree to indemnify and hold the other harmless from and against any claims by any broker, agent, or other person claiming a commission or other form of compensation by virtue of having dealt with Tenant or Landlord respectively with regard to this transaction. The provisions of this Paragraph shall survive the termination of this Lease.

36. **DEFAULT BY LANDLORD:** Landlord shall not be in default, and Tenant shall have no right to any remedy at law or in equity, unless the act, omission, or condition allegedly giving rise to such default shall have continued uncured or unabated for a period of thirty (30) days following written notice to Landlord (with a copy to any Mortgagee as provided in Paragraph 32 above) or, if such cure or abatement cannot be accomplished within said 30-day period, then, so long as Landlord or Mortgagee has commenced such cure or abatement within such 30-day period and diligently pursues same, such period shall be extended a reasonable time to allow completion of the cure or abatement.

37. **MECHANIC'S LIENS:** Tenant shall have no authority, express or implied, to create or place any lien or encumbrance of any kind or nature whatsoever upon, or in any manner to bind, the interest of Landlord in the Leased Premises or the Project or to charge the Rent payable hereunder for any claim in favor of any person dealing with Tenant, including those who may furnish materials or perform labor for any construction or repairs. Each such claim shall affect, and each such lien shall attach to, if at all, only the leasehold interest granted to Tenant by this Lease. Tenant covenants and agrees that it will pay or cause to be paid all sums legally due and payable by it on account of any labor performed or materials furnished in connection with any work performed on the Leased premises on which any lien is or can be validly and legally asserted against its leasehold interest in the Leased Premises or the improvements thereon. Tenant further agrees to save and hold Landlord harmless from any and all loss, cost, or expense based on or arising out of claims or liens asserted by parties by virtue of their dealings with Tenant and encumbering the leasehold estate or the right, title and interest of the Landlord in the Leased Premises or the Project. Under no circumstances shall Tenant be or hold itself out to be the agent or representative of Landlord with respect to any Alterations of the Leased Premises

whether or not consented to or approved by Landlord hereunder.

38. **HAZARDOUS WASTE:** The term "Hazardous Substances," as used in this Lease shall mean petroleum and petroleum products and by-products, crude oil, pollutants, contaminants, toxic or hazardous wastes, or any other substances, the use of which is regulated, restricted, prohibited or penalized, or the removal or disposal of which is required, by any "Environmental Laws," which term shall mean any and all federal, state or local law, ordinance or other statute of a governmental or quasi-governmental authority relating to the pollution or protection of the environment. Tenant hereby agrees that (i) no activity will be conducted on the Leased Premises that will produce any Hazardous Substances; (ii) the Leased Premises will not be used in any manner not in compliance with local and federal laws for the storage of any Hazardous Substances; (iii) no portion of the Leased Premises will be used as a landfill or a dump; (iv) Tenant will not install any underground tanks of any type; (v) Tenant will not allow any surface or subsurface conditions to exist or come into existence that constitute, or with the passage of time may constitute, a public or private nuisance, (vi) Tenant will not permit any Hazardous Substances to be brought onto the Leased Premises, and if so brought thereon, then the same shall be stored and used in compliance with all local and federal laws regarding same. Landlord or Landlord's representative shall have the right but not the obligation to enter the Leased Premises for the purpose of ensuring compliance with all Environmental Laws. If Tenant in any manner contaminates the Leased Premises, then Tenant shall promptly and diligently institute proper and thorough clean-up procedures at Tenant's sole cost. Landlord hereby agrees to defend, indemnify and hold Tenant, its employees, partners, agents, contractors, officers and directors and their heirs, successors, and assigns harmless from any and all costs (including costs of litigation), reasonable

18

attorney's fees, expenses, liabilities, claims, damages or judgments arising or alleged to occur, and that result, or are alleged to result from the actual, or threatened discharge, dispersal, disposal, release or escape of Hazardous Substances or other wastes or pollutants (including, but not limited to asbestos, solid, liquid, gaseous or thermal irritants or contaminants, smoke, vapor, soot, fumes, acids, alkalis, chemicals, and water materials to be recycled, reconditioned or reclaimed), but only as the same are a direct result of any act or omission of Landlord or its agents, employees, contractors or subcontractors. Tenant hereby agrees to defend, indemnify and hold Landlord, its employees, agents, partners, contractors, officers and directors of their heirs, successors, and assigns harmless from any and all costs (including costs of litigation), reasonable attorneys' fees, expenses, liabilities, claims, damages or judgments arising or alleged to occur, and that result, or are alleged to result from the actual, or threatened discharge, dispersal, disposal, release or escape of Hazardous Substances or other wastes or pollutants (including, but not limited to asbestos, solid, liquid, gaseous or thermal irritants or contaminants, smoke, vapor, soot, fumes, acids, alkalis, chemicals, and water materials to be recycled, reconditioned or reclaimed), but only as the same are a direct result of any act or omission of Tenant or Tenant's Representatives. Landlord also agrees not to bring hazardous materials into the Leased Premises.

39. **ENTIRE AGREEMENT AND LIMITATION OF WARRANTIES:** It is expressly agreed by Tenant, as a material consideration for the execution of this Lease, that this Lease is the entire agreement of the parties and that there are and were no verbal representations, warranties, understandings, stipulations agreements, or promises pertaining to this Lease not incorporated in this Lease. Tenant expressly agrees that there are and shall be no implied warranties of merchantability, fitness, habitability, or of any other kind and that Tenant's acceptance of the Leased Premises shall be "as is." It is likewise agreed that this Lease may not be altered, waived, amended, or extended except by an instrument in writing signed by both Landlord and Tenant. Not in limitation upon the foregoing, Landlord agrees that to the extent assignable, all warranties, if any shall exist, from contractors or suppliers with respect to the improvements to the Leased Premises hereunder are hereby partially assigned to Tenant to the extent necessary to avail Tenant of the benefits thereof with respect to its leasehold estate and property located at the Leased Premises.

40. **FINANCIAL STATEMENTS:** From time to time Landlord may need to obtain financing or renew financing on the Project, or perform calculations for various reasons regarding the value of the Project. Tenant hereby agrees to provide to Landlord financial statements on its business when requested, but not more than once annually, indicating the most current year end and quarterly financial status of the business. Landlord will

16

not deliver such financial statement to any third party except in confidence and only as required by Landlord's lenders or in conjunction with appraisals of the Project.

41. **FORCE MAJEURE:**

(a) Landlord shall not be required to perform any covenant or obligation of this Lease or be liable in damages to Tenant for that time period during which the performance or non-performance of the covenant or obligation is delayed, caused by, or prevented by Tenant or Tenant's Representatives or by an act of God or force majeure.

(b) Except with respect to the payment of Rent or any other sum due hereunder, Tenant shall not be required to perform any covenant or obligation of this Lease or be liable in damages to Landlord for that time period during which the performance or non-performance of the covenant or obligation is delayed, caused by, or prevented by Landlord or Landlord's Representatives or by an act of God or force majeure.

(c) An "act of God" or "force majeure" is defined for purposes of this Lease as strikes, lockouts, sit-downs, material or labor restrictions by any governmental authority, riots, floods, washouts, explosions, earthquakes, fire storms, acts of the public enemy, wars, insurrections and

19

any other similar cause not reasonably within the control of Landlord and which by the exercise of due diligence Landlord is unable, wholly or in part, to prevent or overcome.

42. **MISCELLANEOUS:**

(a) Words of any gender used in this Lease shall be held and construed to include any other gender; and words in the singular number shall be held to include the plural, unless the context otherwise requires.

(b) Each party agrees to furnish to the other, promptly upon demand, a corporate resolution, proof of due authorization by partners, or other appropriate documentation evidencing the due authorization and power of such party to enter into this Lease and the empowerment and authority of the individual signing below to bind his or her principal.

(c) The captions inserted in this Lease are for convenience only and in no way define, limit, or otherwise describe the scope or intent of this Lease or any provision hereof, or in any way affect the interpretation of this Lease.

(d) If any clause or provision of this Lease is illegal, invalid, or unenforceable under present or future laws effective during the term of this Lease, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby; and it is also the intention of the parties to this Lease that in lieu of each clause or provision of this Lease that is illegal, invalid, or unenforceable there be added as a part of this Lease a clause as similar in terms to such illegal, invalid, or unenforceable clause or provision as may be possible and be legal, valid, and enforceable.

(e) Intentionally deleted.

(f) All references in this Lease to "the date hereof" or similar references shall be deemed to refer to the last date, in point of time, on which all parties hereto have executed this Lease.

(g) In the event that Tenant shall fail to perform any duty or obligation hereunder, whether maintenance, repair or replacement of the Leased Premises, maintenance of insurance, or otherwise, then Landlord may, but shall in no event be obligated to, without notice of any kind, take such actions as Landlord deems necessary or appropriate to remedy such Tenant failure, and any sums expended by Landlord together with fair and just compensation for the time and effort of Landlord in such efforts shall be deemed additional Rent hereunder due and payable by Tenant on demand.

(h) If Tenant shall fail to pay, when the same is due and payable, any Rent or any other sum due hereunder, such unpaid amount shall bear interest from the clue date thereof to the date of remittance at the rate of the lesser of 12% per annum and the maximum rate allowed by law.

(i) Landlord does not in any way or for any purpose become a partner with Tenant in the conduct of its business or otherwise, nor a member of a joint venture with Tenant.

(j) Tenant shall not record this Lease without the prior written consent of Landlord. However, upon the request of either party hereto, the other party shall join in the execution of a memorandum or so-called

17

"short form" of this Lease for the purposes of recordation.

(k) Time is of the essence in the performance of all the covenants, conditions, and agreements contained in this Lease.

(l) Any duty, obligation, or debt and any right or remedy arising hereunder and not otherwise consummated and/or extinguished by the express terms hereof at or as of the time of termination of this Lease, whether at the end of the term hereof or otherwise, shall survive such termination as continuing duties, obligations, and debts of the obligated party to the other or continuing rights and remedies of the benefited party against the other.

<div align="center">20</div>

(m) This Agreement may be executed in one or more counterparts, each of which counterpart shall for all purposes be deemed to be an original; but all such counterparts together shall constitute but one instrument.

(n) Attached hereto, marked Exhibit "A" through Exhibit "F", are certain exhibits to this Lease all of which are hereby incorporated herein by reference

(o) Landlord agrees to allow Tenant at Tenant's sole cost and expense to install a basketball goal on the Leased Premises as long as such installation does not materially interfere with or reduce the available parking for the Project. Tenant agrees to restore the Leased Premises to its original condition upon Lease termination or Tenant's vacating of the Leased Premises.

### 43. NOTICE:

(a) All Rent and other payments required to be made by Tenant to Landlord shall be payable to Landlord at the address set forth below or any other address that Landlord may specify from time to time by written notice delivered to Tenant.

(b) All payments, if any, required to be made by Landlord to Tenant shall be payable to Tenant at the address set forth below or at any other address that Tenant may specify from time to time by written notice delivered to Landlord.

(c) Any notice or document required or permitted to be delivered by this Lease shall be deemed to be delivered (whether or not actually received) when deposited in the United States Mail, postage prepaid, certified mail return receipt requested, addressed to the parties at the respective addresses set forth below or such other address as hereinafter specified by notice given in accordance with this paragraph.

### 44. LIMITATION ON TENANT'S DAMAGES: 
Tenant agrees that any liability of Landlord under this Lease shall be limited solely to Landlord's interest in the Project, and no other assets of Landlord shall be subject to levy or execution.

Executed by Landlord and Tenant as of this __27th__ day of December, 2005

**LANDLORD**                                      **TENANT**

Embassy Row, LLC                         **The Embassy of the Kingdom of Morocco**
238 Brookville Road                       **1601 21st Street, N.W**
Muttontown, N.Y. 11545                   Washington, D.C. 20009

By: _Darshan Shah by Anne Smith_        By: _Aicha Afifi, Mahamed El Hajjji_

Title: _Managing Dir / Agent_           Title: _DCM / Amb_

Date: _1/09/06_                          Date: _01/09/06_

18

The guaranty hereunder shall be unconditional and absolute and the undersigned waive all rights of subrogation and set-off until all sums under this guaranty are fully paid. The undersigned further waives all suretyship defenses or defenses in the nature thereof, generally.

If there are two or more guarantors to this guaranty, the obligations shall be joint and several and binding upon and inure to the benefit of the parties, their successors, assigns and personal representatives.


Guaranty:_____


Date:_____

19

# EXHIBIT A

**Legal Description: Lot 45 / Square 2532 Subdivision of Kalorama, more particularly known as
2113 S Street, N.W., Washington, D.C. 20008**

# EXHIBIT B

## TENANT IMPROVEMENTS

Landlord is to cure any and all deferred maintenance in and about property. Landlord is responsible for all repairs to bring building into conformance with standardized building codes of the District of Columbia. All systems (HVAC, plumbing, electrical, security) shall be in good operating condition, and water, gas, and electrical service will be available to the Building.

22

## EXHIBIT "C"
Intentionally Deleted

23

## EXHIBIT "D"

### RULES AND REGULATIONS

The following Rules and Regulations are prescribed by Landlord in order to provide and maintain, to the best of Landlord's ability, orderly, clean and desirable premises, building and parking facilities for the Tenants therein and to regulate conduct in and use of the Lease Premises, the Building and parking facilities in such a manner as to minimize interference by others in the proper use of the Leased Premises by Tenant. All references to Tenant include not only the Tenant, but also Tenant's agents, employees, invitees, licensees, visitors, assignees, and/or sublesses:

1. Tenant shall not block or obstruct any of the entries, passages, or doors of Building or parking area, or place, empty, or throw rubbish, litter, trash, or material of any nature into such areas, or permit such areas to be used at any time except for ingress or egress of Tenants.

2. Landlord will not be responsible for lost or stolen personal property, equipment, money, or any article taken from the Leased Premises, Building, or parking facilities regardless of how or when loss occurs.

3. The plumbing facilities shall not be used for any other purpose than that of which they are constructed, and no foreign substance of any kind shall be placed therein, and the expense of any breakage, stoppage, or damage resulting from a violation of this provision shall be borne by Tenant.

4. Any additional keys or locks required by Tenant during the term of the Lease shall be the Tenant's responsibility.

5. The common parking facilities are available for use by any and all tenants. Landlord reserves the right to assign or allocate parking in the event of conflicts, abuse, or improper use. It is generally understood that any Tenant should utilize only those parking spaces immediately adjacent to that Tenant's Leased Premises.

Any blockage by any vehicle to any means of ingress or egress to any leased premises, or in

20

"short form" of this Lease for the purposes of recordation.

(k) Time is of the essence in the performance of all the covenants, conditions, and agreements contained in this Lease.

(l) Any duty, obligation, or debt and any right or remedy arising hereunder and not otherwise consummated and/or extinguished by the express terms hereof at or as of the time of termination of this Lease, whether at the end of the term hereof or otherwise, shall survive such termination as continuing duties, obligations, and debts of the obligated party to the other or continuing rights and remedies of the benefited party against the other.

<center>20</center>

(m) This Agreement may be executed in one or more counterparts, each of which counterpart shall for all purposes be deemed to be an original; but all such counterparts together shall constitute but one instrument.

(n) Attached hereto, marked Exhibit "A" through Exhibit "F", are certain exhibits to this Lease all of which are hereby incorporated herein by reference

(o) Landlord agrees to allow Tenant at Tenant's sole cost and expense to install a basketball goal on the Leased Premises as long as such installation does not materially interfere with or reduce the available parking for the Project. Tenant agrees to restore the Leased Premises to its original condition upon Lease termination or Tenant's vacating of the Leased Premises.

43. **NOTICE:**

(a) All Rent and other payments required to be made by Tenant to Landlord shall be payable to Landlord at the address set forth below or any other address that Landlord may specify from time to time by written notice delivered to Tenant.

(b) All payments, if any, required to be made by Landlord to Tenant shall be payable to Tenant at the address set forth below or at any other address that Tenant may specify from time to time by written notice delivered to Landlord.

(c) Any notice or document required or permitted to be delivered by this Lease shall be deemed to be delivered (whether or not actually received) when deposited in the United States Mail, postage prepaid, certified mail return receipt requested, addressed to the parties at the respective addresses set forth below or such other address as hereinafter specified by notice given in accordance with this paragraph.

44. **LIMITATION ON TENANT'S DAMAGES:** Tenant agrees that any liability of Landlord under this Lease shall be limited solely to Landlord's interest in the Project, and no other assets of Landlord shall be subject to levy or execution.

Executed by Landlord and Tenant as of this 27th day of December, 2005

**LANDLORD**                                          **TENANT**

Embassy Row, LLC                        **The Embassy of the Kingdom of Morocco**
238 Brookville Road                      **1601 21st Street, N.W**
Muttontown, N.Y. 11545                   **Washington, D.C. 20009**

By: _[signature]_                        By: _Aicha Afifi, Mohamed El Hajuj_
    for Landlord                         Title: _DCM / Ambassay_
Title: _Managing Member_
       _Embassy Row LLC_
Date: _01/16/06_                         Date: _01/09/06_

18

JS-44
(Rev.1/05 DC)

**CIVIL COVER SHEET**

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Dr. Darashan Shah d/b/a Embassy Row, LLC<br>238 Brookville Road<br>Muttontown, NY 11545 | The Kingdom of Morocco<br>Avenue F. Roosevelt - Rabat - MOROCCO |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)   Morocco
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Richard W. Luchs, D.C. Bar # 243931
Joshua M. Greenberg, D.C. Bar # 489323
Greenstein DeLorme & Luchs, P.C.
1620 L Street, N.W., Suite 900
Washington, D.C. 20036

ATTORNEYS (IF KNOWN)

---

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

○ 2 U.S. Government Defendant

○ 3 Federal Question (U.S. Government Not a Party)

◉ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ◉ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ◉ 6 |

---

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

◉ **E. General Civil (Other)**     OR     ○ **F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☒ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G.** *Habeas Corpus/ 2255* | ○ **P** *Employment Discrimination* | ○ **I.** *FOIA/P. `ACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ **530 Habeas Corpus-General** <br> ☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment** <br> (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) <br><br> *(If pro se, select this deck)* | ☐ **895 Freedom of Information Act** <br> ☐ **890 Other Statutory Actions** <br> (if Privacy Act) <br><br> *(If pro se, select this deck)* | ☐ **152 Recovery of Defaulted Student Loans (excluding veterans)** |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act** <br> ☐ **720 Labor/Mgmt. Relations** <br> ☐ **730 Labor/Mgmt. Reporting & Disclosure Act** <br> ☐ **740 Labor Railway Act** <br> ☐ **790 Other Labor Litigation** <br> ☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)** <br> ☐ **443 Housing/Accommodations** <br> ☐ **444 Welfare** <br> ☐ **440 Other Civil Rights** <br> ☐ **445 American w/Disabilities-Employment** <br> ☐ **446 Americans w/Disabilities-Other** | ☐ **110 Insurance** <br> ☐ **120 Marine** <br> ☐ **130 Miller Act** <br> ☐ **140 Negotiable Instrument** <br> ☐ **150 Recovery of Overpayment & Enforcement of Judgment** <br> ☐ **153 Recovery of Overpayment of Veteran's Benefits** <br> ☐ **160 Stockholder's Suits** <br> ☐ **190 Other Contracts** <br> ☐ **195 Contract Product Liability** <br> ☐ **196 Franchise** | ☐ **441 Civil Rights-Voting (if Voting Rights Act)** |

## V. ORIGIN

● 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Cause of action for damages for unpaid rent under commercial lease agreement.  Jurisdiction based on Foreign Sovereign Immunities Act.

## VII. REQUESTED IN COMPLAINT

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ 160,419.60    Check YES only if demanded in compla    JURY DEMAND:    YES ☐    NO ☐

## VIII. RELATED CASE(S) IF ANY

(See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE  11/3/06    SIGNATURE OF ATTORNEY OF RECORD  _____

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  Listed below are tips for completing the civil cover sheet.  These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT:  The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint.  You may select only one category.  You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

# NOTICE OF SUIT

(Pursuant to 28 U.S.C.S §1608(a)(3) and 22 C.F.R. 93.2)

| | |
|---|---|
| **Title of legal proceeding:** | <u>Dr. Darashan Shah d/b/a Embassy Row, LLC v. The Kingdom of Morocco</u> |
| **Full Name of Court:** | United States District Court for the District of Columbia |
| **Case No:** | _____ |
| **Name of Foreign State:** | The Kingdom of Morocco |
| **Identity of the Parties** | |
|     **Plaintiff:** | Dr. Darashan Shah d/b/a Embassy Row, LLC |
|     **Defendant:** | The Kingdom of Morocco |
| **Nature of Documents Served:** | Summons and Complaint |

**Nature and Purpose of the Proceedings:** Plaintiff (Landlord) seeks judgment against Defendant (Tenant) in the amount of $160,419.60 which amount includes unpaid rent, real estate taxes, insurance and service charges under to the Commercial Lease Agreement signed by the parties to lease the premises located at 2113 S Street, N.W., Washington, D.C. 20008.


A response to a "Summons" and "Complaint" is required to be submitted to the court, not later than sixty (60) days after these documents are received. The response may present jurisdictional defenses (including defenses relating to state immunity).

The failure to submit a timely response with the court can result in a Default Judgment and a request for execution to satisfy the judgment. If a default judgment is entered, a procedure may be available to vacate or open that judgment.

Questions regarding the state immunities and to the jurisdiction of United States courts over foreign states are governed by the Foreign Sovereign Immunities Act of 1976, which appears in sections 1330, 1391(f), 1441(d), and 1602 through 1611, of Title 28, United States Code (Pub. L. 94-583; 90 Stat. 2891).

299280v1

PUBLIC LAW 94–583—OCT. 21, 1976          90 STAT. 2891

## Public Law 94–583
## 94th Congress

## An Act

To define the jurisdiction of United States courts in suits against foreign states, the circumstances in which foreign states are immune from suit and in which execution may not be levied on their property, and for other purposes.

*Oct. 21, 1976*
[H.R. 11315]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Foreign Sovereign Immunities Act of 1976".

Foreign Sovereign Immunities Act of 1976. 28 USC 1 note.

SEC. 2. (a) That chapter 85 of title 28, United States Code, is amended by inserting immediately before section 1331 the following new section:

## "§ 1330. Actions against foreign states

"(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

28 USC 1330. Jurisdiction.

*Post,* p. 2892.

"(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

"(c) For purposes of subsection (b), an appearance by a foreign state does not confer personal jurisdiction with respect to any claim for relief not arising out of any transaction or occurrence enumerated in sections 1605–1607 of this title.".

*Post,* p. 2894.

(b) By inserting in the chapter analysis of that chapter before—

"1331. Federal question; amount in controversy; costs."

the following new item:

"1330. Action against foreign states.".

SEC. 3. That section 1332 of title 28, United States Code, is amended by striking subsections (a) (2) and (3) and substituting in their place the following:

"(2) citizens of a State and citizens or subjects of a foreign state;

"(3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

"(4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.".

SEC. 4. (a) That title 28, United States Code, is amended by inserting after chapter 95 the following new chapter:

## "Chapter 97.—JURISDICTIONAL IMMUNITIES OF FOREIGN STATES

"Sec.
"1602. Findings and declaration of purpose.
"1603. Definitions.
"1604. Immunity of a foreign state from jurisdiction.
"1605. General exceptions to the jurisdictional immunity of a foreign state.
"1606. Extent of liability.

90 STAT. 2892          PUBLIC LAW 94–583—OCT. 21, 1976

"1607. Counterclaims.
"1608. Service; time to answer default.
"1609. Immunity from attachment and execution of property of a foreign state.
"1610. Exceptions to the immunity from attachment or execution.
"1611. Certain types of property immune from execution.

28 USC 1602.     "**§ 1602. Findings and declaration of purpose**

"The Congress finds that the determination by United States courts of the claims of foreign states to immunity from the jurisdiction of such courts would serve the interests of justice and would protect the rights of both foreign states and litigants in United States courts. Under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities. Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter.

28 USC 1603.     "**§ 1603. Definitions**

"For purposes of this chapter—

"(a) A 'foreign state', except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

"(b) An 'agency or instrumentality of a foreign state' means any entity—

"(1) which is a separate legal person, corporate or otherwise, and

"(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

"(3) which is neither a citizen of a State of the United States as defined in section 1332 (c) and (d) of this title, nor created under the laws of any third country.

"(c) The 'United States' includes all territory and waters, continental or insular, subject to the jurisdiction of the United States.

"(d) A 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

"(e) A 'commercial activity carried on in the United States by a foreign state' means commercial activity carried on by such state and having substantial contact with the United States.

28 USC 1604.     "**§ 1604. Immunity of a foreign state from jurisdiction**

"Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

28 USC 1605.     "**§ 1605. General exceptions to the jurisdictional immunity of a foreign state**

"(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

"(1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of

PUBLIC LAW 94–583—OCT. 21, 1976          90 STAT. 2893

the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;

"(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

"(3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States;

"(4) in which rights in property in the United States acquired by succession or gift or rights in immovable property situated in the United States are in issue; or

"(5) not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to—

"(A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

"(B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

"(b) A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which a suit in admiralty is brought to enforce a maritime lien against a vessel or cargo of the foreign state, which maritime lien is based upon a commercial activity of the foreign state: *Provided*, That— *Suit in admiralty.*

*Notice.*

"(1) notice of the suit is given by delivery of a copy of the summons and of the complaint to the person, or his agent, having possession of the vessel or cargo against which the maritime lien is asserted; but such notice shall not be deemed to have been delivered, nor may it thereafter be delivered, if the vessel or cargo is arrested pursuant to process obtained on behalf of the party bringing the suit—unless the party was unaware that the vessel or cargo of a foreign state was involved, in which event the service of process of arrest shall be deemed to constitute valid delivery of such notice; and

"(2) notice to the foreign state of the commencement of suit as provided in section 1608 of this title is initiated within ten days either of the delivery of notice as provided in subsection (b) (1) of this section or, in the case of a party who was unaware that the vessel or cargo of a foreign state was involved, of the date such party determined the existence of the foreign state's interest. Whenever notice is delivered under subsection (b) (1) of this section, the maritime lien shall thereafter be deemed to be an in personam

**90 STAT. 2894**     PUBLIC LAW 94–583—OCT. 21, 1976

claim against the foreign state which at that time owns the vessel or cargo involved: *Provided*, That a court may not award judgment against the foreign state in an amount greater than the value of the vessel or cargo upon which the maritime lien arose, such value to be determined as of the time notice is served under subsection (b) (1) of this section.

28 USC 1606.    **"§ 1606. Extent of liability**

"As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances; but a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages; if, however, in any case wherein death was caused, the law of the place where the action or omission occurred provides, or has been construed to provide, for damages only punitive in nature, the foreign state shall be liable for actual or compensatory damages measured by the pecuniary injuries resulting from such death which were incurred by the persons for whose benefit the action was brought.

28 USC 1607.    **"§ 1607. Counterclaims**

"In any action brought by a foreign state, or in which a foreign state intervenes, in a court of the United States or of a State, the foreign state shall not be accorded immunity with respect to any counterclaim—

"(a) for which a foreign state would not be entitled to immunity under section 1605 of this chapter had such claim been brought in a separate action against the foreign state; or

"(b) arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state; or

"(c) to the extent that the counterclaim does not seek relief exceeding in amount or differing in kind from that sought by the foreign state.

28 USC 1608.    **"§ 1608. Service; time to answer; default**

"(a) Service in the courts of the United States and of the States shall be made upon a foreign state or political subdivision of a foreign state:

"(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

"(2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

"(3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

"(4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of

Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

As used in this subsection, a 'notice of suit' shall mean a notice addressed to a foreign state and in a form prescribed by the Secretary of State by regulation.

"Notice of suit."

"(b) Service in the courts of the United States and of the States shall be made upon an agency or instrumentality of a foreign state:

"(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality; or

"(2) if no special arrangement exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents; or

"(3) if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state—

"(A) as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request or

"(B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or

"(C) as directed by order of the court consistent with the law of the place where service is to be made.

"(c) Service shall be deemed to have been made—

"(1) in the case of service under subsection (a)(4), as of the date of transmittal indicated in the certified copy of the diplomatic note; and

"(2) in any other case under this section, as of the date of receipt indicated in the certification, signed and returned postal receipt, or other proof of service applicable to the method of service employed.

"(d) In any action brought in a court of the United States or of a State, a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state shall serve an answer or other responsive pleading to the complaint within sixty days after service has been made under this section.

"(e) No judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court. A copy of any such default judgment shall be sent to the foreign state or political subdivision in the manner prescribed for service in this section.

"§ 1609. Immunity from attachment and execution of property of a foreign state

28 USC 1609.

"Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property

in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter.

28 USC 1610.

"§ 1610. Exceptions to the immunity from attachment or execution

"(a) The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if—

"(1) the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, or

"(2) the property is or was used for the commercial activity upon which the claim is based, or

"(3) the execution relates to a judgment establishing rights in property which has been taken in violation of international law or which has been exchanged for property taken in violation of international law, or

"(4) the execution relates to a judgment establishing rights in property—

"(A) which is acquired by succession or gift, or

"(B) which is immovable and situated in the United States: *Provided,* That such property is not used for purposes of maintaining a diplomatic or consular mission or the residence of the Chief of such mission, or

"(5) the property consists of any contractual obligation or any proceeds from such a contractual obligation to indemnify or hold harmless the foreign state or its employees under a policy of automobile or other liability or casualty insurance covering the claim which merged into the judgment.

"(b) In addition to subsection (a), any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if—

"(1) the agency or instrumentality has waived its immunity from attachment in aid of execution or from execution either explicitly or implicitly, notwithstanding any withdrawal of the waiver the agency or instrumentality may purport to effect except in accordance with the terms of the waiver, or

"(2) the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605(a) (2), (3), or (5), or 1605(b) of this chapter, regardless of whether the property is or was used for the activity upon which the claim is based.

"(c) No attachment or execution referred to in subsections (a) and (b) of this section shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter.

PUBLIC LAW 94–583—OCT. 21, 1976          90 STAT. 2897

"(d) The property of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment prior to the entry of judgment in any action brought in a court of the United States or of a State, or prior to the elapse of the period of time provided in subsection (c) of this section, if—

"(1) the foreign state has explicitly waived its immunity from attachment prior to judgment, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, and

"(2) the purpose of the attachment is to secure satisfaction of a judgment that has been or may ultimately be entered against the foreign state, and not to obtain jurisdiction.

"**§ 1611. Certain types of property immune from execution**          28 USC 1611.

"(a) Notwithstanding the provisions of section 1610 of this chapter, the property of those organizations designated by the President as being entitled to enjoy the privileges, exemptions, and immunities provided by the International Organizations Immunities Act shall not          22 USC 288 note. be subject to attachment or any other judicial process impeding the disbursement of funds to, or on the order of, a foreign state as the result of an action brought in the courts of the United States or of the States.

"(b) Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution, if—

"(1) the property is that of a foreign central bank or monetary authority held for its own account, unless such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution, notwithstanding any withdrawal of the waiver which the bank, authority or government may purport to effect except in accordance with the terms of the waiver; or

"(2) the property is, or is intended to be, used in connection with a military activity and

"(A) is of a military character, or

"(B) is under the control of a military authority or defense agency."

(b) That the analysis of "PART IV.—JURISDICTION AND VENUE" of title 28, United States Code, is amended by inserting after—

"95. Customs Court.",

the following new item:

"97. Jurisdictional Immunities of Foreign States.".

SEC. 5. That section 1391 of title 28, United States Code, is amended          Venue. by adding at the end thereof the following new subsection:

"(f) A civil action against a foreign state as defined in section 1603(a) of this title may be brought—

"(1) in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated;

"(2) in any judicial district in which the vessel or cargo of a foreign state is situated, if the claim is asserted under section 1605(b) of this title;

90 STAT. 2898                PUBLIC LAW 94–583—OCT. 21, 1976

"(3) in any judicial district in which the agency or instrumentality is licensed to do business or is doing business, if the action is brought against an agency or instrumentality of a foreign state as defined in section 1603(b) of this title; or

"(4) in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof.".

**Actions removable.**

SEC. 6. That section 1441 of title 28, United States Code, is amended by adding at the end thereof the following new subsection:

"(d) Any civil action brought in a State court against a foreign state as defined in section 1603(a) of this title may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending. Upon removal the action shall be tried by the court without jury. Where removal is based upon this subsection, the time limitations of section 1446(b) of this chapter may be enlarged at any time for cause shown.".

**28 USC 1446.**

**28 USC 1602 note.**

SEC. 7. If any provision of this Act or the application thereof to any foreign state is held invalid, the invalidity does not affect other provisions or applications of the Act which can be given effect without the invalid provision or application, and to this end the provisions of this Act are severable.

**Effective date.**
**28 USC 1602 note.**

SEC. 8. This Act shall take effect ninety days after the date of its enactment.

Approved October 21, 1976.

---

LEGISLATIVE HISTORY:

HOUSE REPORT No. 94–1487 (Comm. on the Judiciary).
SENATE REPORT No. 94–1310 accompanying S. 3553 (Comm. on the Judiciary).
CONGRESSIONAL RECORD, Vol. 122 (1976):
    Sept. 29, considered and passed House.
    Oct. 1, considered and passed Senate.
WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 12, No. 43:
    Oct. 22, Presidential statement.

UNITED STATES CODE SERVICE
Copyright © 2006 Matthew Bender & Company, Inc.,
one of the LEXIS Publishing (TM) companies
All rights reserved

*** CURRENT THROUGH P.L. 109-287, APPROVED 9/27/2006 ***

TITLE 28. JUDICIARY AND JUDICIAL PROCEDURE
PART IV. JURISDICTION AND VENUE
CHAPTER 87. DISTRICT COURTS; VENUE

28 USCS § 1391

§ 1391.  Venue generally

(a) A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

(b) A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

(c) For purposes of venue under this chapter [28 USCS §§ 1391 et seq.], a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced. In a State which has more than one judicial district and in which a defendant that is a corporation is subject to personal jurisdiction at the time an action is commenced, such corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State, and, if there is no such district, the corporation shall be deemed to reside in the district within which it has the most significant contacts.

(d) An alien may be sued in any district.

(e) A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which (1) a defendant in the action resides, (2) a substantial part of the events

or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) the plaintiff resides if no real property is involved in the action. Additional persons may be joined as parties to any such action in accordance with the Federal Rules of Civil Procedure and with such other venue requirements as would be applicable if the United States or one of its officers, employees, or agencies were not a party.

The summons and complaint in such an action shall be served as provided by the Federal Rules of Civil Procedure except that the delivery of the summons and complaint to the officer or agency as required by the rules may be made by certified mail beyond the territorial limits of the district in which the action is brought.

(f) A civil action against a foreign state as defined in section 1603(a) of this title [28 USCS § 1603(a)] may be brought--
   (1) in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated;
   (2) in any judicial district in which the vessel or cargo of a foreign state is situated, if the claim is asserted under section 1605(b) of this title [28 USCS § 1605(b)];
   (3) in any judicial district in which the agency or instrumentality is licensed to do business or is doing business, if the action is brought against an agency or instrumentality of a foreign state as defined in section 1603(b) of this title [28 USCS § 1603(b)]; or
   (4) in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof.

(g) A civil action in which jurisdiction of the district court is based upon section 1369 of this title [28 USCS § 1369] may be brought in any district in which any defendant resides or in which a substantial part of the accident giving rise to the action took place.

UNITED STATES CODE SERVICE
Copyright © 2006 Matthew Bender & Company, Inc.,
one of the LEXIS Publishing (TM) companies
All rights reserved

*** CURRENT THROUGH P.L. 109-287, APPROVED 9/27/2006 ***

TITLE 28. JUDICIARY AND JUDICIAL PROCEDURE
PART IV. JURISDICTION AND VENUE
CHAPTER 89. DISTRICT COURTS; REMOVAL OF CASES FROM STATE COURTS

28 USCS § 1441

§ 1441.  Actions removable generally

(a) Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending. For purposes of removal under this chapter [28 USCS §§ 1441 et seq.], the citizenship of defendants sued under fictitious names shall be disregarded.

(b) Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties. Any other such action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.

(c) Whenever a separate and independent claim or cause of action within the jurisdiction conferred by section 1331 of this title [28 USCS § 1331] is joined with one or more otherwise nonremovable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters in which State law predominates.

(d) Any civil action brought in a State court against a foreign state as defined in section 1603(a) of this title [28 USCS § 1603(a)] may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending. Upon removal the action shall be tried by the court without jury. Where removal is based upon this subsection, the time limitations of section 1446(b) of this chapter [28 USCS § 1446(b)] may be enlarged at any time for cause shown.

(e) (1) Notwithstanding the provisions of subsection (b) of this section, a defendant in a civil action in a State court may remove the action to the district court of the United States for the district and division embracing the place where the action is pending if--

(A) the action could have been brought in a United States district court under section 1369 of this title [28 USCS § 1369]; or

(B) the defendant is a party to an action which is or could have been brought, in whole or in part, under section 1369 [28 USCS § 1369] in a United States district court and arises from the same accident as the action in State court, even if the action to be removed could not have been brought in a district court as an original matter.

The removal of an action under this subsection shall be made in accordance with section 1446 of this title [28 USCS § 1446], except that a notice of removal may also be filed before trial of the action in State court within 30 days after the date on which the defendant first becomes a party to an action under section 1369 [28 USCS § 1369] in a United States district court that arises from the same accident as the action in State court, or at a later time with leave of the district court.

(2) Whenever an action is removed under this subsection and the district court to which it is removed or transferred under section 1407(j) [28 USCS § 1407(j)] has made a liability determination requiring further proceedings as to damages, the district court shall remand the action to the State court from which it had been removed for the determination of damages, unless the court finds that, for the convenience of parties and witnesses and in the interest of justice, the action should be retained for the determination of damages.

(3) Any remand under paragraph (2) shall not be effective until 60 days after the district court has issued an order determining liability and has certified its intention to remand the removed action for the determination of damages. An appeal with respect to the liability determination of the district court may be taken during that 60-day period to the court of appeals with appellate jurisdiction over the district court. In the event a party files such an appeal, the remand shall not be effective until the appeal has been finally disposed of. Once the remand has become effective, the liability determination shall not be subject to further review by appeal or otherwise.

(4) Any decision under this subsection concerning remand for the determination of damages shall not be reviewable by appeal or otherwise.

(5) An action removed under this subsection shall be deemed to be an action under section 1369 [28 USCS § 1369] and an action in which jurisdiction is based on section 1369 of this title [28 USCS § 1369] for purposes of this section and sections 1407, 1697, and 1785 of this title [28 USCS §§ 1407, 1697, and 1785].

(6) Nothing in this subsection shall restrict the authority of the district court to transfer or dismiss an action on the ground of inconvenient forum.

(f) The court to which a civil action is removed under this section is not precluded from hearing and determining any claim in such civil action because the State court from which such civil action is removed did not have jurisdiction over that claim.



<u>إخطار بقضية</u>

(بموجب القانون رقم 28 من نظام المحاكم بالولايات الأمريكية والبند 1608 (أ) (3) و22 من مدونة التنظيمات الفيدرالية 93.2)

اسم منشأة اتخاذ الإجراءات القانونية:    <u>دكتور دارشان شاه d/b/a إمباسي رو، LCC ضد المملكة المغربية</u>

اسم المحكمة بالكامل:    المحكمة العليا لمقاطعة كولومبيا بالولايات المتحدة الأمريكية

القضية رقم:    _____

اسم الدولة الأجنبية:    المملكة المغربية

هوية طرفي النزاع

المدعي:    دكتور دارشان شاه d/b/a إمباسي رو، LCC
المدعى عليه:    المملكة المغربية

طبيعة الوثائق المعلنة قضائيًا:    إعلان بالحضور وشكاوى

طبيعة وغرض إجراءات التقاضي: المدعي (المالك) يطلب الفصل القضائي ضد المدعى عليه (المستأجر) في مبلغ 160419.60 دولار أمريكي ويشمل هذا المبلغ قيمة الإيجار غير المدفوع والضرائب العقارية ومصروفات التأمين والخدمات بموجب عقد الإيجار التجاري الموقع بواسطة الطرفين لاستئجار المبنى الكائن في 2113 شارع S. N.W.، واشنطن دي سي 20008.

يتعين الرد على "الإعلان بالحضور" و "الشكاوى" إلى المحكمة، في فترة لا تتجاوز ستين (60) يومًا بعد استلام هذه الوثائق. يجوز أن يعتبر الرد للمحكمة دفوعًا قضائيًا (بما في ذلك الدفوع المتعلقة بالحصانة الدبلوماسية لممثلي الدول).

يمكن أن يؤدي الإخفاق في تقديم رد في الموعد المناسب إلى إصدار حكم غيابي وإصدار طلب تنفيذ الحكم استيفاءً للحكم القضائي. في حالة صدور حكم غيابي، يجوز أن يكون هناك إجراء متاح لإلغاء الحكم أو استئناف ذلك الحكم.

الأسئلة المتعلقة بالحصانة الدبلوماسية والإجراءات القانونية لمحاكم الولايات المتحدة الأمريكية بشأن الدول الأجنبية تخضع لقانون حصانات السيادة الأجنبية لعام 1976، الوارد في الأقسام 1330 و1391 (f) و1391 (d) و1441 و1602 حتى القسم 1611، من العنوان 28 مدونة قوانين الولايات المتحدة الأمريكية (القانون العام 94-583، 90 البيان 2891).

PUBLIC LAW 94–583—OCT. 21, 1976          90 STAT. 2891

Public Law 94–583
94th Congress

## An Act

To define the jurisdiction of United States courts in suits against foreign states, the circumstances in which foreign states are immune from suit and in which execution may not be levied on their property, and for other purposes.

Oct. 21, 1976
[H.R. 11315]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Foreign Sovereign Immunities Act of 1976".

SEC. 2. (a) That chapter 85 of title 28, United States Code, is amended by inserting immediately before section 1331 the following new section:

Foreign Sovereign Immunities Act of 1976.
28 USC 1 note.

"§ 1330. Actions against foreign states

"(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

"(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

"(c) For purposes of subsection (b), an appearance by a foreign state does not confer personal jurisdiction with respect to any claim for relief not arising out of any transaction or occurrence enumerated in sections 1605–1607 of this title.".

(b) By inserting in the chapter analysis of that chapter before—

"1331. Federal question; amount in controversy; costs."

the following new item:

"1330. Action against foreign states.".

28 USC 1330.
Jurisdiction.

*Post,* p. 2892.

*Post,* p. 2894.

SEC. 3. That section 1332 of title 28, United States Code, is amended by striking subsections (a) (2) and (3) and substituting in their place the following:

"(2) citizens of a State and citizens or subjects of a foreign state;

"(3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

"(4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.".

SEC. 4. (a) That title 28, United States Code, is amended by inserting after chapter 95 the following new chapter:

"Chapter 97.—JURISDICTIONAL IMMUNITIES OF FOREIGN STATES

"Sec.
"1602. Findings and declaration of purpose.
"1603. Definitions.
"1604. Immunity of a foreign state from jurisdiction.
"1605. General exceptions to the jurisdictional immunity of a foreign state.
"1606. Extent of liability.

90 STAT. 2892          PUBLIC LAW 94–583—OCT. 21, 1976

"1607. Counterclaims.
"1608. Service; time to answer default.
"1609. Immunity from attachment and execution of property of a foreign state.
"1610. Exceptions to the immunity from attachment or execution.
"1611. Certain types of property immune from execution.

28 USC 1602.　"§ 1602. Findings and declaration of purpose

"The Congress finds that the determination by United States courts of the claims of foreign states to immunity from the jurisdiction of such courts would serve the interests of justice and would protect the rights of both foreign states and litigants in United States courts. Under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities. Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter.

28 USC 1603.　"§ 1603. Definitions

"For purposes of this chapter—
"(a) A 'foreign state', except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).
"(b) An 'agency or instrumentality of a foreign state' means any entity—
"(1) which is a separate legal person, corporate or otherwise, and
"(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
"(3) which is neither a citizen of a State of the United States as defined in section 1332 (c) and (d) of this title, nor created under the laws of any third country.
"(c) The 'United States' includes all territory and waters, continental or insular, subject to the jurisdiction of the United States.
"(d) A 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.
"(e) A 'commercial activity carried on in the United States by a foreign state' means commercial activity carried on by such state and having substantial contact with the United States.

28 USC 1604.　"§ 1604. Immunity of a foreign state from jurisdiction

"Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

28 USC 1605.　"§ 1605. General exceptions to the jurisdictional immunity of a foreign state

"(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
"(1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of

PUBLIC LAW 94-583—OCT. 21, 1976          90 STAT. 2893

the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;

"(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

"(3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States;

"(4) in which rights in property in the United States acquired by succession or gift or rights in immovable property situated in the United States are in issue; or

"(5) not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to—

"(A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

"(B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

"(b) A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which a suit in admiralty is brought to enforce a maritime lien against a vessel or cargo of the foreign state, which maritime lien is based upon a commercial activity of the foreign state: *Provided*, That—

"(1) notice of the suit is given by delivery of a copy of the summons and of the complaint to the person, or his agent, having possession of the vessel or cargo against which the maritime lien is asserted; but such notice shall not be deemed to have been delivered, nor may it thereafter be delivered, if the vessel or cargo is arrested pursuant to process obtained on behalf of the party bringing the suit—unless the party was unaware that the vessel or cargo of a foreign state was involved, in which event the service of process of arrest shall be deemed to constitute valid delivery of such notice; and

"(2) notice to the foreign state of the commencement of suit as provided in section 1608 of this title is initiated within ten days either of the delivery of notice as provided in subsection (b)(1) of this section or, in the case of a party who was unaware that the vessel or cargo of a foreign state was involved, of the date such party determined the existence of the foreign state's interest.

Whenever notice is delivered under subsection (b)(1) of this section, the maritime lien shall thereafter be deemed to be an in personam

Suit in admiralty.

Notice.

90 STAT. 2894          PUBLIC LAW 94–583—OCT. 21, 1976

claim against the foreign state which at that time owns the vessel or cargo involved: *Provided*, That a court may not award judgment against the foreign state in an amount greater than the value of the vessel or cargo upon which the maritime lien arose, such value to be determined as of the time notice is served under subsection (b) (1) of this section.

28 USC 1606.  **"§ 1606. Extent of liability**

"As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances; but a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages; if, however, in any case wherein death was caused, the law of the place where the action or omission occurred provides, or has been construed to provide, for damages only punitive in nature, the foreign state shall be liable for actual or compensatory damages measured by the pecuniary injuries resulting from such death which were incurred by the persons for whose benefit the action was brought.

28 USC 1607.  **"§ 1607. Counterclaims**

"In any action brought by a foreign state, or in which a foreign state intervenes, in a court of the United States or of a State, the foreign state shall not be accorded immunity with respect to any counterclaim—

"(a) for which a foreign state would not be entitled to immunity under section 1605 of this chapter had such claim been brought in a separate action against the foreign state; or

"(b) arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state; or

"(c) to the extent that the counterclaim does not seek relief exceeding in amount or differing in kind from that sought by the foreign state.

28 USC 1608.  **"§ 1608. Service; time to answer; default**

"(a) Service in the courts of the United States and of the States shall be made upon a foreign state or political subdivision of a foreign state:

"(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

"(2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

"(3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

"(4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of

Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

As used in this subsection, a 'notice of suit' shall mean a notice addressed to a foreign state and in a form prescribed by the Secretary of State by regulation.

    "Notice of suit."

"(b) Service in the courts of the United States and of the States shall be made upon an agency or instrumentality of a foreign state:

    "(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality; or

    "(2) if no special arrangement exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents; or

    "(3) if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state—

        "(A) as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request or

        "(B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or

        "(C) as directed by order of the court consistent with the law of the place where service is to be made.

"(c) Service shall be deemed to have been made—

    "(1) in the case of service under subsection (a)(4), as of the date of transmittal indicated in the certified copy of the diplomatic note; and

    "(2) in any other case under this section, as of the date of receipt indicated in the certification, signed and returned postal receipt, or other proof of service applicable to the method of service employed.

"(d) In any action brought in a court of the United States or of a State, a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state shall serve an answer or other responsive pleading to the complaint within sixty days after service has been made under this section.

"(e) No judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court. A copy of any such default judgment shall be sent to the foreign state or political subdivision in the manner prescribed for service in this section.

"§ 1609. Immunity from attachment and execution of property of a foreign state

    28 USC 1609.

"Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property

in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter.

28 USC 1610.    **"§ 1610. Exceptions to the immunity from attachment or execution**

"(a) The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if—

"(1) the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, or

"(2) the property is or was used for the commercial activity upon which the claim is based, or

"(3) the execution relates to a judgment establishing rights in property which has been taken in violation of international law or which has been exchanged for property taken in violation of international law, or

"(4) the execution relates to a judgment establishing rights in property—

"(A) which is acquired by succession or gift, or

"(B) which is immovable and situated in the United States: *Provided,* That such property is not used for purposes of maintaining a diplomatic or consular mission or the residence of the Chief of such mission, or

"(5) the property consists of any contractual obligation or any proceeds from such a contractual obligation to indemnify or hold harmless the foreign state or its employees under a policy of automobile or other liability or casualty insurance covering the claim which merged into the judgment.

"(b) In addition to subsection (a), any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if—

"(1) the agency or instrumentality has waived its immunity from attachment in aid of execution or from execution either explicitly or implicitly, notwithstanding any withdrawal of the waiver the agency or instrumentality may purport to effect except in accordance with the terms of the waiver, or

"(2) the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605(a) (2), (3), or (5), or 1605(b) of this chapter, regardless of whether the property is or was used for the activity upon which the claim is based.

"(c) No attachment or execution referred to in subsections (a) and (b) of this section shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter.

PUBLIC LAW 94–583—OCT. 21, 1976    90 STAT. 2897

"(d) The property of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment prior to the entry of judgment in any action brought in a court of the United States or of a State, or prior to the elapse of the period of time provided in subsection (c) of this section, if—

"(1) the foreign state has explicitly waived its immunity from attachment prior to judgment, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, and

"(2) the purpose of the attachment is to secure satisfaction of a judgment that has been or may ultimately be entered against the foreign state, and not to obtain jurisdiction.

"§ 1611. Certain types of property immune from execution    28 USC 1611.

"(a) Notwithstanding the provisions of section 1610 of this chapter, the property of those organizations designated by the President as being entitled to enjoy the privileges, exemptions, and immunities provided by the International Organizations Immunities Act shall not    22 USC 288 note. be subject to attachment or any other judicial process impeding the disbursement of funds to, or on the order of, a foreign state as the result of an action brought in the courts of the United States or of the States.

"(b) Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution, if—

"(1) the property is that of a foreign central bank or monetary authority held for its own account, unless such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution, notwithstanding any withdrawal of the waiver which the bank, authority or government may purport to effect except in accordance with the terms of the waiver; or

"(2) the property is, or is intended to be, used in connection with a military activity and

"(A) is of a military character, or

"(B) is under the control of a military authority or defense agency."

(b) That the analysis of "PART IV.—JURISDICTION AND VENUE" of title 28, United States Code, is amended by inserting after—

"95. Customs Court.",

the following new item:

"97. Jurisdictional Immunities of Foreign States.".

SEC. 5. That section 1391 of title 28, United States Code, is amended    Venue. by adding at the end thereof the following new subsection:

"(f) A civil action against a foreign state as defined in section 1603(a) of this title may be brought—

"(1) in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated;

"(2) in any judicial district in which the vessel or cargo of a foreign state is situated, if the claim is asserted under section 1605(b) of this title;

**90 STAT. 2898**          PUBLIC LAW 94–583—OCT. 21, 1976

"(3) in any judicial district in which the agency or instrumentality is licensed to do business or is doing business, if the action is brought against an agency or instrumentality of a foreign state as defined in section 1603(b) of this title; or

"(4) in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof.".

*Actions removable.*

SEC. 6. That section 1441 of title 28, United States Code, is amended by adding at the end thereof the following new subsection:

"(d) Any civil action brought in a State court against a foreign state as defined in section 1603(a) of this title may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending. Upon removal the action shall be tried by the court without jury. Where removal is based upon this subsection, the time limitations of section 1446(b) of this chapter may be enlarged at any time for cause shown.".

*28 USC 1446.*

*28 USC 1602 note.*

SEC. 7. If any provision of this Act or the application thereof to any foreign state is held invalid, the invalidity does not affect other provisions or applications of the Act which can be given effect without the invalid provision or application, and to this end the provisions of this Act are severable.

*Effective date.*
*28 USC 1602 note.*

SEC. 8. This Act shall take effect ninety days after the date of its enactment.

Approved October 21, 1976.

---

LEGISLATIVE HISTORY:

HOUSE REPORT No. 94–1487 (Comm. on the Judiciary).
SENATE REPORT No. 94–1310 accompanying S. 3553 (Comm. on the Judiciary).
CONGRESSIONAL RECORD, Vol. 122 (1976):
    Sept. 29, considered and passed House.
    Oct. 1, considered and passed Senate.
WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 12, No. 43:
    Oct. 22, Presidential statement.

UNITED STATES CODE SERVICE
Copyright © 2006 Matthew Bender & Company, Inc.,
one of the LEXIS Publishing (TM) companies
All rights reserved

*** CURRENT THROUGH P.L. 109-287, APPROVED 9/27/2006 ***

TITLE 28. JUDICIARY AND JUDICIAL PROCEDURE
PART IV. JURISDICTION AND VENUE
CHAPTER 87. DISTRICT COURTS; VENUE

28 USCS § 1391

§ 1391.  Venue generally

(a) A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

(b) A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

(c) For purposes of venue under this chapter [28 USCS §§ 1391 et seq.], a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced. In a State which has more than one judicial district and in which a defendant that is a corporation is subject to personal jurisdiction at the time an action is commenced, such corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State, and, if there is no such district, the corporation shall be deemed to reside in the district within which it has the most significant contacts.

(d) An alien may be sued in any district.

(e) A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which (1) a defendant in the action resides, (2) a substantial part of the events

or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) the plaintiff resides if no real property is involved in the action. Additional persons may be joined as parties to any such action in accordance with the Federal Rules of Civil Procedure and with such other venue requirements as would be applicable if the United States or one of its officers, employees, or agencies were not a party.

The summons and complaint in such an action shall be served as provided by the Federal Rules of Civil Procedure except that the delivery of the summons and complaint to the officer or agency as required by the rules may be made by certified mail beyond the territorial limits of the district in which the action is brought.

(f) A civil action against a foreign state as defined in section 1603(a) of this title [28 USCS § 1603(a)] may be brought--

   (1) in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated;

   (2) in any judicial district in which the vessel or cargo of a foreign state is situated, if the claim is asserted under section 1605(b) of this title [28 USCS § 1605(b)];

   (3) in any judicial district in which the agency or instrumentality is licensed to do business or is doing business, if the action is brought against an agency or instrumentality of a foreign state as defined in section 1603(b) of this title [28 USCS § 1603(b)]; or

   (4) in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof.

(g) A civil action in which jurisdiction of the district court is based upon section 1369 of this title [28 USCS § 1369] may be brought in any district in which any defendant resides or in which a substantial part of the accident giving rise to the action took place.

UNITED STATES CODE SERVICE
Copyright © 2006 Matthew Bender & Company, Inc.,
one of the LEXIS Publishing (TM) companies
All rights reserved

*** CURRENT THROUGH P.L. 109-287, APPROVED 9/27/2006 ***

TITLE 28. JUDICIARY AND JUDICIAL PROCEDURE
PART IV. JURISDICTION AND VENUE
CHAPTER 89. DISTRICT COURTS; REMOVAL OF CASES FROM STATE COURTS

28 USCS § 1441

§ 1441.  Actions removable generally

(a) Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending. For purposes of removal under this chapter [28 USCS §§ 1441 et seq.], the citizenship of defendants sued under fictitious names shall be disregarded.

(b) Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties. Any other such action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.

(c) Whenever a separate and independent claim or cause of action within the jurisdiction conferred by section 1331 of this title [28 USCS § 1331] is joined with one or more otherwise nonremovable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters in which State law predominates.

(d) Any civil action brought in a State court against a foreign state as defined in section 1603(a) of this title [28 USCS § 1603(a)] may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending. Upon removal the action shall be tried by the court without jury. Where removal is based upon this subsection, the time limitations of section 1446(b) of this chapter [28 USCS § 1446(b)] may be enlarged at any time for cause shown.

(e) (1) Notwithstanding the provisions of subsection (b) of this section, a defendant in a civil action in a State court may remove the action to the district court of the United States for the district and division embracing the place where the action is pending if--

(A) the action could have been brought in a United States district court under section 1369 of this title [28 USCS § 1369]; or

(B) the defendant is a party to an action which is or could have been brought, in whole or in part, under section 1369 [28 USCS § 1369] in a United States district court and arises from the same accident as the action in State court, even if the action to be removed could not have been brought in a district court as an original matter.

The removal of an action under this subsection shall be made in accordance with section 1446 of this title [28 USCS § 1446], except that a notice of removal may also be filed before trial of the action in State court within 30 days after the date on which the defendant first becomes a party to an action under section 1369 [28 USCS § 1369] in a United States district court that arises from the same accident as the action in State court, or at a later time with leave of the district court.

(2) Whenever an action is removed under this subsection and the district court to which it is removed or transferred under section 1407(j) [28 USCS § 1407(j)] has made a liability determination requiring further proceedings as to damages, the district court shall remand the action to the State court from which it had been removed for the determination of damages, unless the court finds that, for the convenience of parties and witnesses and in the interest of justice, the action should be retained for the determination of damages.

(3) Any remand under paragraph (2) shall not be effective until 60 days after the district court has issued an order determining liability and has certified its intention to remand the removed action for the determination of damages. An appeal with respect to the liability determination of the district court may be taken during that 60-day period to the court of appeals with appellate jurisdiction over the district court. In the event a party files such an appeal, the remand shall not be effective until the appeal has been finally disposed of. Once the remand has become effective, the liability determination shall not be subject to further review by appeal or otherwise.

(4) Any decision under this subsection concerning remand for the determination of damages shall not be reviewable by appeal or otherwise.

(5) An action removed under this subsection shall be deemed to be an action under section 1369 [28 USCS § 1369] and an action in which jurisdiction is based on section 1369 of this title [28 USCS § 1369] for purposes of this section and sections 1407, 1697, and 1785 of this title [28 USCS §§ 1407, 1697, and 1785].

(6) Nothing in this subsection shall restrict the authority of the district court to transfer or dismiss an action on the ground of inconvenient forum.

(f) The court to which a civil action is removed under this section is not precluded from hearing and determining any claim in such civil action because the State court from which such civil action is removed did not have jurisdiction over that claim.